[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15405

_____

D.C. Docket No. 1:16-cr-20091-KMW-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JULIO ESTRADA,
BARTOLO HERNANDEZ,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 13, 2020)

Before ROSENBAUM, JILL PRYOR and BRANCH, Circuit Judges.

JILL PRYOR, Circuit Judge:

Julio Estrada, a baseball trainer, and Bartolo Hernandez, a baseball manager, partnered with business professionals, human traffickers, and members of a Mexican criminal organization to smuggle baseball players out of Cuba and into the United States so that the players could enter into lucrative "free agent" contracts with Major League Baseball ("MLB") teams.[1]  At the time of the events underlying this appeal, MLB rules required Cuban citizens to obtain "unblocking" licenses from the United States Treasury Department's Office of Foreign Assets Control ("OFAC") before they could enter into free agent contracts.  To obtain unblocking licenses, the players were required to prove that they had moved to a third country with no intention of returning to Cuba.  The defendants' operation would smuggle players into Mexico, Haiti, or the Dominican Republic, where Estrada, Hernandez, and other co-conspirators would procure fraudulent documents to establish the players' residencies in those countries.  The players used the false residency documents to obtain unblocking licenses permitting them to contract with MLB teams.  Sometimes they also relied on the false documents to obtain visas, which allowed them to come to the United States to play baseball.

---

[1] MLB defines "free agent" as a player who "is eligible to sign with any club for any terms to which the two parties can agree."  *What Is Free Agency?*, MLB (last visited July 1, 2020), http://m.mlb.com/glossary/transactions/free-agency.

A federal grand jury charged Estrada and Hernandez with smuggling four Cuban baseball players into the United States, in violation of 8 U.S.C. § 1324(a)(2),[2] and conspiring to commit crimes against the United States.  At trial, the government's theory of prosecution was that Estrada and Hernandez, along with others not parties to this appeal, aided and abetted in bringing noncitizens[3] into the United States.  After a 30-day trial, the jury convicted them of conspiring to bring and bringing four noncitizen Cuban players into the United States.  On appeal, Estrada and Hernandez raise several challenges to their convictions, including whether:  (1) the district court erred in ruling that the Cuban Adjustment Act ("CAA") and the Wet-Foot/Dry-Foot policy did not provide the players with "prior official authorization" to come to, enter, or reside in the United States under § 1324(a)(2); (2) there was sufficient evidence to support their convictions; and (3) the district court committed evidentiary errors.  After a thorough review of the parties' briefs and the record, and with the benefit of oral argument, we affirm their convictions.

---

[2] Section 1324(a)(2) of Title 8 provides: "Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien, shall" be punished according to the statute.  8 U.S.C. § 1324(a)(2).

[3] We use the term "noncitizens" as an equivalent for the statutory term "aliens."  *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1689 n.2 (2020).

# I.    FACTUAL BACKGROUND

This case arises out of a scheme to smuggle Cuban baseball players into the United States.  Estrada and Hernandez facilitated the smuggling operation in four ways:  first, they helped the players move from Cuba to either Mexico, Haiti, or the Dominican Republic; second, they procured fraudulent residency documents for the players, which they used to obtain OFAC "unblocking" licenses; third, they used the fraudulent residency documents to obtain visas for the players to enter the United States; fourth, they facilitated the physical bringing of noncitizens to the border.  In exchange for their work, Estrada and Hernandez charged a percentage of the players' free agent contracts, which often were worth millions of dollars. Below we recount the events that led to the defendants' convictions.[4]

## A.    Hernandez Works with a Retired Baseball Player and Human Trafficker to Form the Smuggling Operation

Hernandez, a sports agent who "specialized in Cuban baseball players," owned and operated Global Sports Management.  Doc. 527 at 16.[5]  As an agent, Hernandez negotiated with MLB teams on the players' behalf.  As compensation, the players paid him an agent's fee.  One of his business partners was Scott

---

[4] The facts are taken from the evidence adduced at trial and are stated in the light most favorable to the government.  *See United States v. Robertson*, 493 F.3d 1322, 1329 (11th Cir. 2007) (stating that, in reviewing a challenge to the sufficiency of the evidence, we "view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict" (internal quotation marks omitted)).

[5] Citations in the form "Doc. #" refer to entries on the district court's docket.

4

Shapiro, an immigration attorney.  Estrada became the company's baseball director.

The scheme began when Rider Reyes—a retired baseball player who lived in Miami—started organizing an operation to smuggle Cuban players into the United States so they could enter MLB contracts.  To that end, he contacted Alberto Ramos—a known human trafficker with boats for smuggling players.  Reyes and Ramos needed money to finance the operation, so they called Hernandez.

Hernandez and Reyes met at a mall to discuss the smuggling operation.  Reyes told Hernandez that he had a contact, Ramos, who could smuggle players to the United States in go-fast boats.  He also showed Hernandez a list of Cuban baseball players.  Hernandez picked players from the list that interested him, and he and Reyes discussed bringing those players to the United States.  Hernandez then decided to call Estrada.

Three days later, Hernandez and Reyes met again.  This time, Estrada and Ramos joined them.  The men discussed which players to target and how they would go about smuggling the players out of Cuba.  Estrada told the group that he had a cousin from the Dominican Republic who could contact Cuban players about their interest in being smuggled into the United States.  Estrada's cousin joined them at later meetings.  They determined that Reyes, Ramos, and Estrada would physically move the players out of Cuba.  Estrada made "various phone calls to

5

Cuba" and told the conspirators that they "could start." Doc. 517 at 85–86. They initially decided that the players would be taken to Cancun, Mexico.

While the smuggling operation was underway, a man called Nacho contacted Reyes. Nacho told Reyes that he had smuggled a player into Cancun, and unless Reyes paid him $50,000, he would beat the player. Nacho, along with his "right-hand man" Eliezer Lazo ("Lazo Sr."), worked for a separate smuggling operation in Cancun. Doc. 514 at 57. In response to Nacho's threat, Hernandez, Ramos, and Reyes traveled to Cancun, where they met Nacho at a restaurant. There, Nacho told the group that he worked for a criminal organization and that he had to pay a tax—or "piso"—of $2,000 to that organization to smuggle immigrants into the United States. Doc. 517 at 104. Nacho and Hernandez left the group to discuss the $50,000. When they returned, Nacho told the men that Hernandez was "going to do business with [him]." *Id*. at 105.

At the same restaurant meeting, the men—including Nacho—discussed the baseball smuggling operation. Nacho agreed to help manage the baseball players while they were in Cancun. Hernandez explained the concepts of free agency and "unblocking" to Nacho. *Id*. at 106. He also defined the terms of the smuggling operation's agreement with the players. He explained that they would charge a percentage (up to thirty or thirty-five percent) of the value of the players' contracts and divide that money among themselves. They each agreed on their share of the

players' contracts.  Once the meeting was over, Hernandez, Reyes, and Ramos all agreed that Nacho—who was always surrounded by armed bodyguards—"was a very dangerous person." *Id*. at 107.  Back in Miami, the conspirators signed contracts to formalize the deal.

A few months later, Estrada traveled to Cancun to meet Nacho.  They discussed smuggling more players and dividing the proceeds from the players' MLB contracts.  Estrada also met Diana Tilbert, a business operator who was involved in smuggling Cuban citizens into Mexico.

**B.      The Smuggling Operation Begins Smuggling Cuban Players to Mexico**

The operation began smuggling Cuban players to Cancun by boat.  One player described the trip as "tough."  Doc. 515 at 64.  Once they arrived in Cancun, Hernandez would meet the players and explain the concept of free agency and the necessity of unblocking licenses, which would allow them to enter MLB contracts. To help the players establish residency, Nacho would pay a Mexican immigration official to produce fraudulent residency documents.  The players would list fake jobs like "tinsmith" and "welder" on their documents, and they would joke about their fake jobs in front of Estrada.  Doc. 514 at 72; 515 at 73.  The players understood that the fake jobs would allow them to establish residency in Mexico.

Hernandez was responsible for preparing the players' unblocking applications.  He would include the players' Mexican residency papers in the

7

applications.  OFAC granted the applications and issued the players unblocking licenses, which allowed them to enter into contracts with MLB.  Hernandez also worked on securing visas for the players.  Once the players received their visas, they could enter the United States.  While they were in Mexico, Estrada trained the players.

## C.    Nacho Disappears, and the Remaining Men Form Estrellas del Beisbol

One day, Nacho drove two baseball players to a boatyard in Cancun.  left his car and was approached by two men wearing hoods.  One of the players in the car reported hearing gunshots.  The players escaped and told Estrada, Lazo Sr., and other players what happened.  After Nacho's disappearance, Lazo Sr. took over Nacho's previous role in smuggling the players out of Cuba, and the operation moved from Cancun to Mexico City.  Estrada accompanied the players to Mexico City.

Once in Mexico City, Lazo Sr. formed the company Estrellas del Beisbol on Estrada's and Hernandez's advice.  Estrada partnered with Lazo Sr. to help him form the corporation.  Lazo Sr. agreed to pay Estrada a percentage of the players' MLB contracts.

## D.    Leonys Martin Is Smuggled into the United States

Leonys Martin, a centerfielder from Cuba, was smuggled out of Cuba with his family by boat and taken to Cancun pursuant to a plan organized by Lazo Sr.

8

and Martinez.  In Cancun, Martin offered to pay Lazo Sr. $40,000 for smuggling Martin and his family out of Cuba and requested that he and his family be handed over to a different smuggling organization whom Martin knew from Cuba.  Lazo Sr. refused the offer.  He said that Martin now "belonged to" the smuggling operation and owed it $2.5 million.  Doc. 519 at 60.  Martin spoke to Hernandez and agreed to pay Estrellas del Beisbol thirty percent and Hernandez five percent of his future MLB contract.  Eventually, the Texas Rangers offered Martin a contract for $15.5 million.

While in Cancun awaiting a visa, Martin and his family were approached by the different smuggling organization.  Because it was "very hot" (dangerous) in Cancun due to the presence of the other smuggling organization, Lazo Sr. and one of his associates, Joel Martinez, took Martin to Monterrey, Mexico, to "put some distance" between Martin and the other operation.  *Id*. at 64.

At one point, Hernandez explained to Martin that he needed a Cuban passport to become a free agent.  To that end, Hernandez took Martin to the Cuban consulate in Guatemala.  They decided to go to Guatemala because it would be easier to obtain a passport there; unlike Mexico, Guatemala had no "migratory agreement" with Cuba that would require the other country's government to send Martin back to Cuba if he were apprehended.  *Id*. at 74.  The Cuban consulate declined Martin's application for a passport.

9

Back in Mexico, Martin learned of the attempted kidnapping of one of his handlers. Afraid of being kidnapped himself, Martin asked Lazo Sr. if the Rangers would still honor his contract if he crossed the border without a visa. Martin and Lazo Sr. met via video chat, and Hernandez joined on speakerphone. They asked Hernandez to find out whether the Rangers would honor Martin's contract if he entered the United States without a visa. Later that day, Hernandez called back and confirmed that the Rangers would honor the contract.

Martinez took Martin to the United States-Mexico border. Martinez crossed and waited on the United States side for Martin. Then, Martin crossed. He recited to border officials what Martinez had told him to say: he was seeking political asylum, and he had been in Mexico—where he practiced baseball—for seven months. The border officials detained Martin for two days before paroling him into the United States. Martinez took Martin to the airport and they flew together to Miami, where they met Hernandez, Lazo Sr., and others.

Shortly after Martin crossed the border, Hernandez had a phone call with a representative from the Rangers. The contents of the call are unknown, but the Rangers honored the contract and paid Martin, who then paid Lazo Sr. and Martinez $1.35 million. Martin paid Hernandez $225,000. Believing that amount was too low, Hernandez filed an arbitration case against Martin.

10

**E.    The Smuggling Operation Moves to the Dominican Republic and Haiti**

Because Mexico was "very violent," the smuggling operation began smuggling players to the Dominican Republic instead of Mexico.  Doc. 522 at 20. The organization also shifted in another way:  Lazo Sr. was arrested for Medicare fraud, so his son, Eliezer Lazo ("Lazo Jr."), took over the business.

Lazo Jr. was unable to bribe Dominican immigration officials for fraudulent residency documents.  He met with Hernandez to discuss the problem.  Hernandez told Lazo Jr. that Estrada knew a man in Haiti, Amin Latouff, who had government contacts and could help the players establish residency in Haiti.  The operation moved again, to Haiti, and within a month, the players were Haitian residents.  The players signed MLB contracts, but there was a delay in obtaining their visas.

**F.    Omar Luis Enters the United States**

Omar Luis, a Cuban baseball player who was in Haiti waiting for a visa, told Estrada that he was eager to enter the United States.  Estrada advised him to wait for a visa.  Despite this advice, Estrada called Tilbert, who put Luis into contact with someone who could take him to Mexico and then to the United States— without a visa.  Estrada paid Tilbert's contact $1,500.  Luis flew to Panama, where Estrada met him.  Estrada paid for their tickets to fly together to the United States-Mexican border at Reynosa, Mexico.  There, Luis crossed the border without a visa

11

and was detained by immigration officials in the United States.  Estrada—who crossed the border minutes after Luis—waited for him in Texas.

Luis signed a $4.5 million contract with the Yankees.  He paid Hernandez four percent of the contract and Estrada around $200,000 to $300,000.

## G.    Jose Abreu Enters the United States

Jose Abreu, another Cuban baseball player, independently decided that he wanted to leave Cuba to play in the MLB.  Estrada paid for Abreu to travel by boat from Cuba to Haiti.  In Haiti, Abreu met Latouff, who helped him by obtaining fraudulent residency papers, lodging, and supplies.  Abreu understood that he had to establish residency in Haiti so he could sign a free agent contract with MLB.

After Abreu received his residency papers, he traveled to the Dominican Republic to showcase for MLB scouts.  Once there, he met with Hernandez, Estrada, and others.  Hernandez told him that the Chicago White Sox wanted to sign him, and he had to be in Chicago by a signing deadline.  Abreu wanted to enter the United States without a visa, but he did not mention that to Hernandez or Estrada because he knew they would disapprove.  Instead, Abreu returned to Haiti and reached out to Latouff.  He paid Latouff $15,000 to help him get to Chicago by the signing deadline.  Latouff drove Abreu to the Port-Au-Prince airport, gave him a Haitian passport containing a false name, and told him to follow a man named "Roget," who would guide him through the airport.  At the airport, Roget helped

12

Abreu get through the security checkpoints, and Abreu was able to board a flight to Miami. After he boarded the flight, he followed Latouff's instructions to destroy his passport. He tore off the cover page of his passport and threw away the rest. He ordered a beer and proceeded to eat the cover page of his passport.

Abreu landed in Miami and told a Customs and Border Protection ("CBP") official that he was "claiming the Cuban Adjustment Act." Doc. 525 at 51. Once he was paroled into the United States, he called Estrada, who—along with Hernandez—accompanied him to Chicago. In Chicago, Abreu signed a contract with the White Sox for $68 million. Abreu paid Hernandez five percent and Estrada twenty percent of each installment he received under the contract.

## H.    Dalier Hinojosa Enters the United States

Dalier Hinojosa, a Cuban pitcher, wanted to flee Cuba. Estrada worked with Tilbert to arrange Hinojosa's trip to Haiti, which Estrada funded. With Latouff's help, Hinojosa received a Haitian passport and succeeded in establishing residency in Haiti. At one point, Hinojosa traveled from Haiti to the Dominican Republic to showcase for MLB scouts. In the Dominican Republic, he met with Estrada and Hernandez and signed contracts with them. He agreed to pay Estrada thirty percent and Hernandez five percent of his future MLB contract.

13

When Estrada visited Hinojosa in Haiti, Hinojosa told Estrada that he did not want to stay in Haiti any longer. Estrada told Hinojosa to wait until he obtained a visa to go to the United States.

Hinojosa did not heed this advice. Instead, he paid smugglers $10,000 to send his wife and her friend to the United States; he later paid another $5,000 to the same smugglers so he could enter the United States without a visa. He then met a friend of Latouff's at the Haitian airport. The man told Hinojosa to destroy his Haitian passport on the plane. When Hinojosa landed in Miami, he told a CBP official that people at his baseball training complex had paid the $5,000 smuggling fee. In Miami, he stayed at the house of Estrada's business partner, Yosvannes Pareda, who was an investor in the smuggling operation.

Hinojosa signed a $4.25 million contract with the Boston Red Sox and paid Estrada and Hernandez their percentages from that contract.

## II.    PROCEDURAL BACKGROUND

### A.    Pre-Trial Proceedings

A federal grand jury in the Southern District of Florida returned a superseding indictment charging Estrada and Hernandez with: conspiring to commit offenses against the United States by, among other things, bringing or attempting to bring noncitizens to the United States for the purpose of commercial advantage or private financial gain, in violation of 18 U.S.C. § 371 and 8 U.S.C.

§ 1324(a)(2)(B)(ii) (Count 1); and knowingly bringing or attempting to bring noncitizens to the United States for the purpose of commercial advantage or private financial gain, knowing or in reckless disregard of the fact that the noncitizens did not have prior official authorization to come to, enter, or reside in the United States, in violation of § 1324(a)(2)(B)(ii) (Counts 2, 3, 5, and 6).  As to the substantive smuggling charges in Counts 2, 3, 5, and 6, Hernandez was charged with the smuggling of Martin (Count 2), and Estrada was charged with the smuggling of Luis (Count 3), Hinojosa (Count 5), and Abreu (Count 6).[6]

Estrada and Hernandez moved to dismiss the indictment.  They argued that the allegations in the indictment, even if proven, would not establish that they "brought anyone to the United States who could not lawfully enter and reside here," Doc. 111 at 2, because the CAA and the Wet-Foot/Dry-Foot policy—which together permitted Cuban citizens to apply for permanent residency once they reached United States soil, were paroled into the United States, and were physically present in the United States for at least two years—provided the Cuban players with "prior official authorization" to come to, enter, or reside in the United States.  *See* 8 U.S.C. § 1324(a)(2).  Alternatively, they argued that § 1324(a)(2)

---

[6] The government also charged Hernandez with the smuggling of Hinojosa (Count 5) and Abreu (Count 6).  Because the court later granted Hernandez's motion for judgment of acquittal with respect to these counts, they are not at issue in this appeal, and we do not discuss them further.

15

was unconstitutionally vague, in violation of the Fifth Amendment, because it did not define "prior official authorization." The court rejected those arguments and denied the motion to dismiss the indictment based on our decision in *United States v. Dominguez*, 661 F.3d 1051, 1070 (11th Cir. 2011), in which we held that the CAA and the Wet-Foot/Dry-Foot policy did not provide "prior official authorization" for Cuban citizens to come to, enter, or reside in the United States.

The government then filed a "Motion to Exclude Argument Related to Wet Foot/Dry Foot Policy." Doc. 238 at 1. Citing *Dominguez*, the government asserted that the CAA and the Wet-Foot/Dry-Foot policy were irrelevant to whether the Cuban citizens had prior authorization to enter the United States because the players still were required to be "admitted or paroled" upon entering the United States. *Id.* at 3. The court granted the government's motion, reiterating what it concluded in its denial of the motion to dismiss the indictment: that the CAA and the Wet-Foot/Dry-Foot policy were irrelevant to whether a violation of § 1324(a)(2) occurred.

## B.    Trial and Sentencing

Estrada and Hernandez were tried together. The government called numerous witnesses, including: the baseball players named in the indictment (Martin, Luis, Hinojosa, and Abreu); Estrada's and Hernandez's co-conspirators, including Reyes, Lazo Jr., and Tilbert; OFAC agent Tim Smith; and State

Department agent Brian Baer.  In their case, Estrada and Hernandez called Shapiro

as their main witness.  At the close of the government's case and after the defense

rested, Estrada and Hernandez filed motions for judgment of acquittal on all

counts.  The court denied the motions.

Estrada and Hernandez asked the court to instruct the jury that to find them

guilty of alien smuggling, the government had to prove six elements, including that

"[t]he [players] did not have prior official authorization to come to, enter, or reside

in the United States," and "[t]he defendant[s] knew or recklessly disregarded that

the [players] did not have prior official authorization."  Doc. 310 at 28–29.  The

district court rejected those proposed instructions and instead instructed the jury

that the government had to prove beyond a reasonable doubt that:

(1)    the [d]efendant knowingly brought or attempted to bring an alien
        to the United States;

(2)    the [d]efendant knew or was in reckless disregard of the fact that
        the alien had not received prior official authorization to come to,
        enter[,] or reside in the United States; and

(3)    the [d]efendant acted for the purpose of commercial advantage
        or private financial gain.

Doc. 331 at 24.

The jury found Estrada guilty on Counts 1, 3, 5, and 6, and Hernandez guilty

on Counts 1 and 2.  Estrada and Hernandez renewed their motions for judgment of

acquittal, again arguing that the CAA and the Wet-Foot/Dry-Foot policy gave the

17

Cuban players prior official authorization to enter the United States. They also challenged the court's jury instructions, arguing that the "prior official authorization" instruction "misled the jury into believing that it was beyond debate that Cubans cannot legally enter the United States and cannot legally reside here." Doc. 382 at 1–2. They also filed a motion for a new trial, in which they raised numerous evidentiary arguments. The district court denied their motions.

The court sentenced Estrada and Hernandez to total terms of 63 months and 46 months in prison, respectively.[7] This is their appeal.

## III.    ANALYSIS

The defendants raise three primary arguments on appeal.[8] First, they contend that the district court erred by rejecting their arguments related to the CAA and the Wet-Foot/Dry-Foot policy. Second, they argue that the evidence was insufficient to support their convictions. Third, they assert that the court committed numerous evidentiary errors. We consider each argument in turn.

---

[7] While this appeal was pending, Hernandez filed a motion for a reduction in sentence because he was the only potential caregiver for his 84-year-old mother during the current pandemic. The court granted Hernandez's motion and reduced his sentence to time served and placed him on home confinement until April 2021.

[8] Estrada and Hernandez have adopted each other's appellate briefs.

18

**A.    The CAA and the Wet-Foot/Dry-Foot Policy Did Not Provide Prior Official Authorization for the Cuban Players to Come to, Enter, or Reside in the United States.**

Estrada and Hernandez contend that the district court erred by rejecting their arguments related to the CAA and the Wet-Foot/Dry-Foot policy, which were based on the idea that the CAA and the Wet-Foot/Dry-Foot policy provided the Cuban players with "*de facto* authorization" to enter the United States. Estrada Appellant's Br. at 16–17. Noting that the district court had rejected this argument as foreclosed by our decision in *Dominguez*, they contend that *Dominguez* is distinguishable legally and factually. And they assert that the court's purportedly erroneous conclusion that *Dominguez* foreclosed their arguments led it to err by failing to dismiss the superseding indictment, granting the government's motion in limine to exclude arguments relating to the CAA and the Wet-Foot/Dry-Foot policy, and rejecting their proposed "prior official authorization" jury instruction. In addition, they argue that their convictions should be vacated because § 1324(a)(2) is unconstitutionally vague.

We review for an abuse of discretion the district court's denial of the defendants' motion to dismiss the superseding indictment and its failure to give requested jury instructions. *Davis v. United States*, 708 F.3d 1216, 1221 (11th Cir. 2013) (motion to dismiss indictment); *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007) (jury instructions). Likewise, we review the court's grant of the

19

government's motion in limine for an abuse of discretion. *United States v. Harrison*, 534 F.3d 1371, 1373 (11th Cir. 2008). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *United States v. Green*, 873 F.3d 846, 854 (11th Cir. 2017) (internal quotation marks omitted).

We review *de novo* the district court's determination that § 1324(a)(2) is not unconstitutionally vague. *United States v. Fisher*, 289 F.3d 1329, 1333 (11th Cir. 2002). The defendants' vagueness challenge "must be evaluated in the light of the facts of the case at hand." *Id.* (describing the standard for evaluating vagueness challenges that do not involve First Amendment rights).

Before addressing the defendants' individual arguments, we provide some background on United States immigration policy governing Cuban immigrants at the time of their convictions. In 1966, Congress enacted the CAA, which permitted Cuban citizens to apply for permanent residency if they had been admitted or paroled into the United States and physically present in the United States for at least two years. Cuban Adjustment Act, Pub. L. No. 89-732, § 1, 80 Stat. 1161 (1966) (codified as amended at 8 U.S.C. § 1255 note)[9]; *see Dominguez*,

---

[9] The CAA is codified as a historical note to 8 U.S.C. § 1255. The CAA has since been amended by the Victims of Trafficking and Violence Protection Act, Pub. L. No. 106-386,

661 F.3d at 1079 (Tjoflat, J., concurring in part and dissenting in part) (setting forth history of the CAA).  The CAA was beneficial to Cuban nationals because it meant that they did not have to prove that they suffered persecution in Cuba to authorize their presence in the United States.  *Dominguez*, 661 F.3d at 1067 (majority opinion).  The Wet-Foot/Dry-Foot policy limited the scope of the CAA.[10] Under that policy, only Cuban nationals who had "dry feet"—meaning they had reached United States soil—could take advantage of the CAA.  If a Cuban national was interdicted at sea (and therefore had "wet feet"), he would be repatriated to Cuba.  *See Cuba-United States: Joint Statement on Normalization of Migration*, 35 I.L.M. 327, 329 (1996) (stating that "Cuban migrants intercepted at sea by the United States and attempting to enter the United States will be taken to Cuba").

Now, we consider the defendants' individual arguments related to "prior official authorization."

---

§ 1509, 114 Stat. 1464, 1530–31 (2000), and the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 823, 119 Stat. 2960, 3063.  *See Toro v. Sec'y, U.S. Dep't of Homeland Sec.*, 707 F.3d 1224, 1226–27 (11th Cir. 2013) (discussing amendments to the CAA).

[10] President Obama ended the Wet-Foot/Dry-Foot policy at the end of his second term. *See* Office of the Press Secretary, *Statement by the President on Cuban Immigration Policy* (Jan. 12, 2017), *available at* https://obamawhitehouse.archives.gov/the-press-office/2017/01/12/statement-president-cuban-immigration-policy.

### 1.    *Dominguez* Controls Our Decision.

We first address the defendants' argument that *Dominguez* is inapplicable to their case.  In *Dominguez*, we discussed the relationship between the CAA, the Wet-Foot/Dry-Foot policy, and § 1324(a)(2)'s prohibition on smuggling noncitizens into the United States without their having "prior official authorization."  *See Dominguez*, 661 F.3d at 1067–70.

Gustavo Dominguez was charged with smuggling Cuban baseball players into the United States, in violation of § 1324(a)(2).  *Id*. at 1059.  Before trial, the government filed a motion in limine to preclude Dominguez from submitting evidence of the CAA and the Wet-Foot/Dry-Foot policy, arguing that such evidence was irrelevant to his smuggling conviction.  *Id*.  Dominguez responded that he should be permitted to submit the evidence to the jury, as it was relevant to his intent to violate § 1324(a)(2).  *Id*. at 1060.  He explained that he reasonably had believed that the CAA and the Wet-Foot/Dry-Foot policy made the Cuban players eligible to enter the United States.  *Id*. at 1059–60.  The court rejected that argument and granted the government's motion in limine.  *Id*. at 1060.  The court also denied Dominguez's motion for a judgment of acquittal based on the CAA and the Wet-Foot/Dry-Foot policy, again rejecting Dominguez's argument that the law and the policy were relevant to his intent.  *Id*.  At trial, the court instructed the jury that to convict Dominguez for smuggling the Cuban players, the government

22

had to prove that, among other things, he "knew or was in reckless disregard of the fact that the alien had not received prior official authorization to come to or enter the United States." *Id*. at 1072. The jury found Dominguez guilty. *Id*. at 1060.

On appeal, Dominguez challenged the district court's rejection of his arguments related to the CAA and the Wet-Foot/Dry-Foot policy. *Id*. at 1067. We affirmed Dominguez's smuggling convictions, concluding that the "CAA and Wet-Foot/Dry-Foot policy do not provide 'prior official authorization' for an undocumented Cuban to come to the United States." *Id*. at 1070. We explained that the CAA and the Wet-Foot/Dry-Foot policy did not provide "prior official authorization" because "an undocumented Cuban must still be paroled." *Id*. Thus, we concluded that the CAA and the Wet-Foot/Dry-Foot policy "pertain to 'official action which may *later* be taken with respect to'" the players—not "*prior* official authorization" to enter the United States. *Id*. (emphasis added) (quoting 8 U.S.C. § 1324(a)(2)).

The defendants' argument that the CAA and the Wet-Foot/Dry-Foot policy gave the players "prior official authorization" to enter the United States is foreclosed by *Dominguez*. We reject their attempts to distinguish *Dominguez* on legal and factual grounds. First, Hernandez and Estrada assert that *Dominguez* is distinguishable because the primary legal question in that case was whether a § 1324(a)(2) violation required specific intent, but the question here is whether the

23

CAA and the Wet-Foot/Dry-Foot policy provided the Cuban players with "*de facto*" prior official authorization. Estrada Appellant's Br. at 17. We disagree that *Dominguez* is distinguishable on that basis. In *Dominguez*, integral to the defendant's specific intent argument was that he could not have violated § 1324(a)(2) because he believed that the CAA and the Wet-Foot/Dry-Foot policy provided prior official authorization; in rejecting that argument, we held that those provisions did not supply prior authorization. That Estrada and Hernandez have framed their argument differently than Dominguez by focusing on "*de facto*" authorization as opposed to intent to violate § 1324(a)(2) does not make *Dominguez*'s prior official authorization holding inapplicable to their case.

The defendants also argue that *Dominguez* is factually distinguishable because the Cuban players in that case entered the United States at a location other than an official port-of-entry and waited until three months after entry to seek asylum—unlike the players here, who entered at designated ports-of-entry and immediately presented themselves for inspection. But *Dominguez*'s holding was not limited to cases where noncitizens failed to enter designated ports-of-entry and immediately present themselves for inspection. Its reasoning applies with equal force here because when a Cuban citizen enters at designated port-of-entry he still must be paroled, which is a "process that 'reclassifies an alien from one who is illegally remaining in the United States to one who is legally remaining in the

24

United States regardless of how entry into the United States was effected.'" *Dominguez*, 661 F.3d at 1070 (alteration adopted) (quoting *United States v. Medina-Garcia,* 918 F.2d 4, 8 (1st Cir. 1990)).  Put differently, regardless of whether a Cuban citizen enters at a designated port-of-entry and presents himself for inspection, the CAA and the Wet-Foot/Dry-Foot policy provide no "prior official authorization" because they offer no guarantee that the Cuban citizen will be paroled into the United States.  Thus, we are bound by *Dominguez*'s conclusion that the CAA and the Wet-Foot/Dry-Foot policy do not supply "prior official authorization" for Cuban citizens to enter, come to, or reside in the United States. *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (stating that, under the prior panel precedent rule, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*").

Having concluded that *Dominguez* controls this case, we now turn to the defendants' challenges to the district court's specific rulings.

> **2.     The Court Did Not Err in Denying the Motion to Dismiss the Indictment, Granting the Government's Motion in Limine, or Denying the Proposed Jury Instructions.**

Because we conclude that *Dominguez* is authoritative on this issue, we may easily dispose of Estrada's and Hernandez's specific challenges to the district court's rulings.  First, the court did not abuse its discretion or otherwise err in

25

denying the defendants' motion to dismiss the superseding indictment because their argument that the CAA and the Wet-Foot/Dry-Foot policy supplied "prior official authorization" was foreclosed by *Dominguez*. *See Davis*, 708 F.3d at 1221. Second, the court did not err in granting the government's motion in limine to exclude evidence of the CAA and Wet-Foot/Dry-Foot policy because *Dominguez* makes this evidence irrelevant to determining their guilt under § 1324(a)(2). *See United States v. Thompson*, 25 F.3d 1558, 1563 (11th Cir. 1994) (when a district court rules on a motion in limine based on a conclusion of law, we review the court's legal conclusion *de novo*).

Lastly, the court did not abuse its discretion by denying the defendants' requested "prior official authorization" jury instructions. In determining whether the court abused its discretion in rejecting the defendants' proposed instructions, we consider: (1) whether the requested instructions were substantially correct statements of the law; (2) whether the jury charge given addressed the requested instructions; and (3) whether the failure to give the requested instructions seriously impaired their ability to present an effective defense. *Dominguez*, 661 F.3d at 1071.

Even assuming that the defendants' proposed jury instructions were correct statements of the law, the court did not abuse its discretion by rejecting them because the court's jury charge adequately addressed the requested instructions.

26

*See Dominguez*, 661 F.3d at 1072 (rejecting challenge to district court's denial of proposed jury instructions where the given instructions "adequately covered" the defense theory); *see also United States v. Takhalov*, 827 F.3d 1307, 1316 (11th Cir. 2016) (stating that a district court does not err when it declines to give a defense instruction that is "substantially covered by a charge actually given" (internal quotation marks omitted)).  As noted above, the court instructed the jury that it could convict Estrada and Hernandez only if the government proved that they "knew or [were] in reckless disregard of the fact that the alien had not received prior official authorization to come to, enter[,] or reside in the United States." Doc. 331 at 24.  The given jury instruction thus required that, to find a violation of § 1324(a)(2), the jury must find that the players had no prior authorization.  And notably, the "prior official authorization" instruction the court gave was nearly *verbatim* that given by the district court in *Dominguez*, which we affirmed on appeal.  *Dominguez*, 661 F.3d at 1072.  The defendants have shown no abuse of discretion in rejecting their requested jury instruction.

### 3.    "Prior Official Authorization" Is Not Unconstitutionally Vague.

Estrada and Hernandez contend that § 1324(a)(2) is unconstitutionally vague because it does not define "prior official authorization."  They further argue that, even if the term "prior official authorization" is "well understood," the "standards for determining the existence of this authorization" are unclear.  Estrada

27

Appellant's Br. at 35 (internal quotation marks omitted).  Because the statute is vague, they argue, we should reverse their convictions.

The plain meaning of a statute controls our interpretation of that statute unless the language is ambiguous or would lead to an absurd result.  *United States v. Ortega-Torres*, 174 F.3d 1199, 1200 (11th Cir. 1999).  "A criminal statute is unconstitutionally vague if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden."  *Id.* (internal quotation marks omitted).  A statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  Although the void-for-vagueness doctrine "focuses both on actual notice to citizens and arbitrary enforcement," the Supreme Court has explained that "the more important aspect of vagueness doctrine is not actual notice, but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement."  *Id.* at 357–58 (internal quotation marks omitted).  Where Congress fails to provide "minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections."  *Id.* at 358 (alteration adopted) (internal quotation marks omitted).  If there is an interpretation of the statute that makes the statute constitutional, we accept that interpretation.  *Skilling v. United States*,

28

561 U.S. 358, 405–06 (2010) (requiring that, "before striking a federal statute as impermissibly vague, [federal courts] consider whether the prescription is amenable to a limiting construction").

We conclude that § 1324(a)(2) is not unconstitutionally vague.[11]  "Prior official authorization" means permission to come to, enter, or reside in the United States that an immigrant acquired *before* actually coming to, entering, or residing in the United States.  *See* 8 U.S.C. § 1324(a)(2) (criminalizing bringing a noncitizen to the United States where the noncitizen does not have "prior" authorization to come to, enter, or reside in the United States, notwithstanding any "later" official action that authorizes the noncitizen's presence in the United States).  An ordinary person would understand that "authorization" refers to an official action taken by the United States government pursuant to federal immigration law and policy that gives an immigrant permission to be present in the United States.  *See Ortega-Torres*, 174 F.3d at 1200.  For instance, a lawfully-acquired immigrant visa would provide authorization, for the purposes of § 1324(a)(2), to come to, enter, or reside in the United States if the visa was acquired before the immigrant came to, entered, or resided in the United States.  But even if we could imagine scenarios where it would be difficult to determine

---

[11] The defendants have cited no cases addressing whether § 1324(a)(2) is unconstitutionally vague because it fails to define "prior official authorization," and we have not decided the issue.

29

whether a noncitizen has "prior official authorization," that alone would not render the statute impermissibly vague. *See United States v. Williams*, 553 U.S. 285, 306 (2008) (explaining that a statute is not rendered vague merely because of "the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved"). In short, we find § 1324(a)(2) to be sufficiently clear to provide notice to ordinary persons about the conduct that is prohibited and to guide law enforcement.

**B.    The Evidence Was Sufficient to Support the Convictions.**

Estrada and Hernandez next argue that the evidence was insufficient to support their convictions on the substantive smuggling counts and the conspiracy count. We see no error.

We review challenges to the sufficiency of the evidence in criminal cases *de novo*, viewing the evidence in the light most favorable to the government. *United States v. Robertson*, 493 F.3d 1322, 1329 (11th Cir. 2007). "[E]vidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Williams,* 527 F.3d 1235, 1244 (11th Cir. 2008) (internal quotation marks omitted). "We assume that the jury made all credibility choices in support of the verdict" and "accept all reasonable inferences that tend to support the government's case." *Id.* "[P]ut[ting] forth a reasonable hypothesis of innocence" is not enough to show that

30

the evidence was insufficient "because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *United States v. Campo*, 840 F.3d 1249, 1258 (11th Cir. 2016) (internal quotation marks omitted).

> **1.    The Government Presented Sufficient Evidence to Establish that Estrada and Hernandez Aided and Abetted the Smuggling of Cuban Players into the United States.**

Estrada and Hernandez first argue that judgments of acquittal should have been entered on the substantive smuggling counts because the government failed to prove that they "brought," or aided and abetted in bringing, Cuban players to the United States.

To prove a violation of § 1324(a)(2), the government was required to demonstrate, in part, that Estrada and Hernandez brought or attempted to bring the Cuban players to the United States. *See Dominguez*, 661 F.3d at 1063–64; *see also* 8 U.S.C. § 1324(a)(2) (punishing "[a]ny person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, *brings to or attempts to bring to* the United States . . . such alien" (emphasis added)). A conviction under § 1324(a) can be sustained on an aiding-and-abetting theory. *See Dominguez*, 661 F.3d at 1065; *see also* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces[,] or procures its commission, is

31

punishable as a principal."). To prove a substantive smuggling offense under the theory of aiding and abetting, under 18 U.S.C. § 2 "the evidence must establish that (1) the substantive offense was committed by someone; (2) the defendant committed an act which contributed to and furthered the offense; and (3) the defendant intended to aid in its commission." *Dominguez*, 661 F.3d at 1065 (internal quotation marks omitted).

The evidence presented at trial was sufficient to prove that Estrada and Hernandez aided and abetted in bringing Cuban players to the United States. *See id.* As to Estrada, a reasonable jury could have found that the evidence established beyond a reasonable doubt that he aided and abetted in bringing Luis, Abreu, and Hinojosa to the United States. The government presented evidence that showed that Estrada played a significant role in facilitating the players' entries into the United States. *See Williams*, 527 F.3d at 1244. First, the evidence showed that Estrada made "every effort" to ensure that Luis made it to the United States-Mexico border. Doc. 523 at 116. Specifically, Estrada worked with Tilbert to secure Luis's passage and paid Tilbert's immigration contact; paid for Luis's plane ticket from Panama to Reynosa, Mexico and accompanied him on the flight; and crossed the border shortly after Luis and waited for him on the Texas side of the border. By organizing Luis's passage to the United States and funding his journey, Estrada "contributed to and furthered" Luis's border crossing. *See Dominguez*,

661 F.3d at 1065 (evidence that Dominguez financed the smuggling operation showed that he "contributed to and furthered" that operation, which amounted to aiding and abetting in the smuggling); 18 U.S.C. § 2; *see also United States v. Lopez*, 484 F.3d 1186, 1199 (9th Cir. 2007) (en banc) (concluding that "[a] financier who organizes and funds a smuggling operation, . . . whether located in or outside of the United States, may be said to have associated himself with the venture, participated in it as in something he wished to bring about, and sought by his action to make it succeed" (alterations adopted) (internal quotation marks omitted)).

Similarly, Estrada aided and abetted in bringing Hinojosa and Abreu to the United States because he "contributed to and furthered" their moves from Cuba to Haiti and, eventually, the United States. *See* 8 U.S.C. § 2; *Dominguez*, 661 F.3d at 1065. As with Luis, the evidence shows that Estrada financed these players' journeys from Cuba to Haiti. *Dominguez*, 661 F.3d at 1065. Then, in Haiti, Hinojosa and Abreu were put in touch with Estrada's contact, Latouff. Latouff brought Hinojosa and Abreu to the airport to meet his associate, who then guided them through the airport checkpoints so that they could board a plane to the United States. Both men successfully boarded the plane and made it to the United

States.[12] *See United States v. Hill*, 939 F.2d 934, 937 (11th Cir. 1991) (noting that an international airport is an example of a place that is the "functional equivalent" of a border).

We conclude that this evidence sufficed to establish beyond a reasonable doubt that Estrada aided and abetted in bringing Luis, Hinojosa, and Abreu to the United States. *See Campo*, 840 F.3d at 1258.

We also conclude that the evidence supported Hernandez's conviction for aiding and abetting the smuggling of Martin into the United States. *Robertson*, 493 F.3d at 1329. As Estrada did with Luis, Abreu, and Hinojosa, Hernandez played a critical role with Martin. The record shows that Hernandez traveled to Guatemala to secure a passport for Martin, which Martin needed to apply for a visa. Hernandez also contacted MLB to determine whether it would honor Martin's contract if he crossed into the United States without a visa. Then, Martinez took Martin to the border, and they crossed separately. At trial, Martin testified that he crossed the border based on Hernandez's assurance that MLB would honor his contract. Hernandez contests this fact on appeal, pointing to phone records suggesting that Martin crossed the border *before* Hernandez assured him that MLB would honor his contract and contradictory testimony by Martin that

_____

[12] Notably, Estrada does not challenge the government's assertion that the Port-au-Prince airport was the functional equivalent of a border.

34

he never talked to Hernandez "about talking to someone at [MLB]." Doc. 519 at 111. But at this stage, we must make all reasonable inferences in favor of the jury's verdict. *Williams,* 527 F.3d at 1244. We must assume that the jury found credible Martin's testimony that he decided to cross into the United States upon Hernandez's assurances. A reasonable jury could find beyond a reasonable doubt that Hernandez aided and abetted in smuggling Martin into the United States. The evidence therefore was sufficient.

The defendants argue that the government failed to establish the "brings to" element of § 1324(a)(2) because there was no evidence that they, or another co-conspirator, physically accompanied the players across the border. They point to cases from other circuits to support this argument. They cite *United States v. Garcia-Paulin*, 627 F.3d 127 (5th Cir. 2010), in which the Fifth Circuit reversed the defendant's conviction for bringing a noncitizen to the United States where the evidence showed only that the defendant had procured a fraudulent passport stamp for a noncitizen and explained to the noncitizen that the passport would allow him to work in the United States. *Id*. at 130, 133. The Fifth Circuit concluded that the evidence was insufficient to establish a "brings to" offense because it did not show that the defendant played an active role in smuggling the noncitizen into the United States by either accompanying the noncitizen or directing someone "to help the noncitizen cross" the border. *Id*. at 133.

35

The defendants also rely on *United States v. Assadi*, 223 F. Supp. 2d 208 (D.D.C. 2002), in which the United States District Court for the District of Columbia entered a judgment of acquittal on the defendant's § 1324(a)(2) conviction for bringing noncitizens to the United States because the evidence showed only that the defendant "encourage[ed]" the noncitizens to enter the United States illegally. *Id*. at 209–10. In that case, the defendant procured fraudulent passports for noncitizens, bought them airline tickets, took them to the airport, and instructed them to lie to immigration officials, but he did not accompany them on their flights or arrange to have someone meet them in the United States. *Id*. at 211. The court concluded that a "brings to" conviction requires evidence that the defendant "not only help[ed], but also accompan[ied] aliens, or le[d] them, or me[t] them at the border." *Id*. at 210.

We reject the defendants' contention that this case is like *Garcia-Paulin* and *Assadi*, where the evidence was insufficient to establish a "brings to" offense because it did not show that the defendants or someone they directed physically accompanied the players across the border. Evidence of physical accompaniment across the border was not necessary to sustain the defendants' aiding-and-abetting convictions. *See Lopez*, 484 F.3d at 1199 ("It is clear that under certain circumstances a defendant who does not physically transport aliens across the border may be held criminally liable for aiding and abetting a 'brings to'

36

offense."). Rather, it was enough that the defendants and other members of the smuggling operation made all the arrangements for the players' border crossings: either Estrada or another co-conspirator physically accompanied the players "to" the border, and shortly after the players crossed into the United States, someone involved in the smuggling operation met and directed them how to proceed. 8 U.S.C. § 1324(a)(2).

Relatedly, the defendants point to *Lopez*, in which the Ninth Circuit, sitting *en banc*, concluded that the evidence—which showed that the defendant only spoke to the smuggler about where to pick up noncitizens on the United States side of the border—was insufficient to prove that the defendant aided and abetted a "brings to" offense because it did not show that the defendant "knowingly and intentionally commanded, counseled, or encouraged the [smuggler] to commit the 'brings to' offense." 484 F.3d at 1201. But here, in contrast to *Lopez*, the evidence showed that Estrada and Hernandez played an active role in the smuggling operation by involving themselves in nearly every aspect of the scheme—from the initial meetings, to finances, to logistics. They directed the players what to do and say in the border crossings. Estrada and Hernandez were intimately involved in arranging not only the events leading up to the border crossings, but also the aftermath of each crossing. The defendants cannot avoid conviction because their smuggling operation was more sophisticated and meticulously planned and

37

executed than some.  We therefore conclude that the evidence was sufficient to

prove the defendants' substantive smuggling convictions.[13]

**2.      The Government Presented Sufficient Evidence to Establish that Estrada and Hernandez Conspired to Smuggle Cuban Players into the United States.**

The defendants next argue that the evidence was insufficient to establish that

they conspired to commit an offense against the United States, in violation of

§ 371.  We are unconvinced.

To establish a conspiracy under § 371, "the Government must prove (1) that

an agreement existed between two or more persons to commit a crime; (2) that the

defendant knowingly and voluntarily joined or participated in the conspiracy; and

(3) that a conspirator performed an overt act in furtherance of the agreement."

*United States v. Ndiaye,* 434 F.3d 1270, 1294 (11th Cir. 2006).  The crime of

---

[13] The defendants briefly argue that, even if the evidence showed that they aided and abetted in bringing the players to the United States, the government failed to prove that they did so for a commercial advantage or a private financial gain.  *See* 8 U.S.C. § 1324(a)(2)(B)(ii) (criminalizing bringing noncitizens in the United States "for the purpose of commercial advantage or private financial gain").  We disagree; the record is replete with evidence that the entire smuggling operation was planned and conducted for the co-conspirators' financial gain.  Indeed, Estrada and Hernandez did not just finance and arrange for any Cuban citizen to be brought to the United States.  Rather, under the scheme, the defendants identified and recruited talented Cuban players, then helped the players set up residency and obtain false documents in other countries so that the players could acquire OFAC licenses and visas, which would allow them to enter lucrative free agent contracts with MLB.  Estrada and Hernandez then took significant cuts of those contracts.  The evidence easily supports the jury's verdict that Estrada and Hernandez smuggled noncitizens into the United States for a commercial advantage or financial gain.

conspiracy is complete upon the commission of an overt act. *See United States v. Arias,* 431 F.3d 1327, 1340 n.18 (11th Cir. 2005). The existence of a conspiratorial agreement may be proved by "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Mateos*, 623 F.3d 1350, 1362 (11th Cir. 2010) (internal quotation marks omitted). Further, "[a] conspiracy conviction will be upheld if the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." *United States v. Azmat*, 805 F.3d 1018, 1035 (11th Cir. 2015) (internal quotation marks omitted).

We conclude that the government presented sufficient evidence to prove that Estrada and Hernandez conspired, in violation of § 371, to bring Cuban baseball players into the United States in violation of § 1324(a)(2). *See Robertson*, 493 F.3d at 1329. As we have discussed, the evidence showed that: Estrada and Hernandez identified talented Cuban baseball players and partnered with a criminal smuggling organization to smuggle those players into the United States; Estrada either paid for the players' travel expenses or connected them with a contact who would plan and finance their trips from Cuba to the United States border; the smuggling operation paid immigration officials to procure fraudulent residency documents, which Hernandez used to obtain unblocking licenses and visas; Estrada, Hernandez, and other co-conspirators met with the players once they

39

crossed the border and assisted them with MLB negotiations; and Estrada and Hernandez signed contracts with the players obligating them to pay a percentage of their baseball earnings.  The totality of the circumstantial evidence thus supported the jury's conclusion that Estrada and Hernandez knowingly and voluntarily participated in a conspiracy to smuggle Cuban players into the United States.  *See Ndiaye,* 434 F.3d at 1294; *see also Dominguez*, F.3d 661 at 1064 (evidence showing that Dominguez partnered with an associate to form the smuggling operation, funded the operation, and entered contracts obligating players—who were brought to the United States by boat—to pay a percentage of their baseball earnings was sufficient circumstantial evidence to prove a conspiracy to violate § 1324(a)(2)).[14]

## C.    The District Court Committed No Abuse of Discretion in the Challenged Evidentiary Rulings.

Lastly, Estrada and Hernandez raise numerous evidentiary challenges, including that the court erred by:  (1) admitting lay opinion testimony of Smith and Baer; (2) restricting the admission of evidence that would show that Hernandez

---

[14] The indictment also charged that the defendants conspired to (1) knowingly and willfully make a false and material statement; (2) knowingly make use of a false writing; and (3) knowingly possess, use, or obtain a visa that was procured by fraud.  Because the evidence was sufficient to establish the smuggling conspiracy object, we need not consider whether the evidence proved the other conspiracy objects charged in the indictment.  *See United States v. Medina*, 485 F.3d 1291, 1302 (11th Cir. 2007) (explaining that we will uphold a conviction for a multi-object conspiracy when there is sufficient evidence to support a conviction for one of the objects).

40

acted in good faith in preparing OFAC and visa applications; (3) admitting

evidence of uncharged violence and extortion; (4) admitting impermissible hearsay

testimony by Lazo Jr.; and (5) excluding evidence proving that Reyes committed

perjury. They argue that the cumulative effect of the evidentiary errors compels

the reversal of their convictions.

We review the district court's evidentiary rulings for an abuse of discretion.

*United States v. Barsoum*, 763 F.3d 1321, 1338 (11th Cir. 2014). We review *de*

*novo* the district court's interpretation of the Federal Rules of Evidence. *See*

*United States v. Paul*, 175 F.3d 906, 909 (11th Cir. 1999). We address each

evidentiary argument below.

### 1. The District Court Did Not Abuse Its Discretion by Admitting Lay Opinion Testimony.

Estrada and Hernandez first argue that the court abused its discretion by

permitting Smith and Baer to testify about government policy related to unblocking

licenses and visa applications, respectively. They argue that neither Smith nor

Baer had personal knowledge of the players' unblocking and visa applications.

Because Smith and Baer were not qualified as experts, Estrada and Hernandez

assert, their testimony was inadmissible lay opinion testimony.

Under Federal Rule of Evidence 701, a lay witness may offer opinion

testimony if the testimony is "(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a

41

fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. "Notably, Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." *United States v. Jeri*, 869 F.3d 1247, 1265 (11th Cir. 2017) (internal quotation marks omitted).

Here, the district court did not abuse its discretion in admitting Smith's and Baer's testimony. *See Barsoum*, 763 F.3d at 1338. Before trial, Estrada and Hernandez moved to exclude their testimony because the two witnesses were not qualified as experts. The district court denied the motions, concluding that Smith and Baer could present lay opinion testimony about the unblocking and visa applications as long as their testimony was limited to "the policies and practices of their employers." Doc. 246 at 2. At trial, Smith—a senior enforcement officer at OFAC—testified that he had worked at OFAC for 19 years and explained OFAC's licensing process. He further explained that OFAC took misrepresentations in unblocking applications "very seriously." Doc. 511 at 170. Baer testified that he had worked as a special agent at the State Department since 2004 and, in that role, investigated visa and passport fraud. He explained that Cuban nationals were required to have authorizing documents, like a visa, to enter the United States. He further explained the role of residency and employment in the visa review process, the type of conduct that could render someone ineligible for a visa, and the effect

42

of false information on a visa application. Neither Smith nor Baer reviewed the players' unblocking and visa applications at the time they were submitted; rather, they reviewed them as part of the government's investigation into this case.

The court did not abuse its discretion by allowing Smith and Baer to testify about their work because their testimony was rationally based on their perceptions as longtime OFAC and State Department employees. *See Jeri*, 869 F.3d at 1265; *see also Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1223 (11th Cir. 2003) (holding that the district court did not abuse its discretion in admitting lay testimony of repair company employees based on their "particularized knowledge garnered from years of experience within the field"). It does not matter that Smith and Baer were not involved in the players' unblocking and visa applications at issue here; they reviewed the documents in preparation for trial and were permitted to give their impressions of those documents based on their experience in their fields. *See United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011) ("We have allowed a lay witness to base his opinion testimony on his examination of documents even when the witness was not involved in the activity . . . ."). And their testimony was helpful to the finder of fact because it explained the process for reviewing and granting unblocking licenses and visas and emphasized the importance of the residency requirements. *See* Fed. R. Evid. 701(b).

Lastly, their testimony was not based on technical or specialized knowledge within the scope of Rule 702. *See id.* 701(c). The court limited Smith and Baer to testifying about "the policies and practices of their employers." Doc. 246 at 2. The Advisory Committee notes for Rule 701 explain that such testimony is admissible lay opinion testimony because it is "admitted not because of experience, training[,] or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701, advisory committee's note to 2000 amendment (discussing as an example the testimony of business owners or officers); *see Jayyousi*, 657 F.3d at 1104 (concluding that testimony by an FBI agent was lay opinion testimony under Rule 701(c) because his testimony was based on his personal work experience and limited to what he learned by investigating the defendants). We thus conclude that the district court did not abuse its discretion in admitting Smith's and Baer's lay opinion testimony.

### 2. The District Court Did Not Abuse Its Discretion by Excluding Evidence Offered to Rebut Lay Opinion Testimony and Establish a Good Faith Defense.

Estrada and Hernandez next contend that the court abused its discretion by limiting their ability to rebut Smith's and Baer's lay opinion testimony and establish that they acted in good faith to comply with OFAC regulations. In particular, they argue that the court improperly prevented (1) Shapiro from

44

testifying about changes to OFAC regulations and Hernandez's "good faith effort[]" to comply with those regulations, and (2) the defense from submitting evidence of other baseball players who waited for their OFAC licenses and visas before entering the United States—evidence that the defendants contend would have shown their good-faith compliance with the regulations.

At trial, the defendants sought to introduce evidence that Shapiro had studied OFAC regulations and that "OFAC filings" were "within his experience as an attorney." Doc. 529 at 48. They also sought to introduce evidence that some baseball players (none of whom were identified in Estrada's and Hernandez's indictments) waited for their visas and unblocking licenses before crossing into the United States. The district court determined that this evidence was inadmissible. The court prevented Shapiro from testifying about advice that he gave to his clients regarding OFAC regulations or his understanding of those regulations. The court explained that such testimony would be improper because "Mr. Shapiro is a lawyer[,] [h]e is not an agent[,] [and] [h]e does not work for OFAC or the Government." *Id.* at 51. And the court determined that the evidence that related to other baseball players had little probative value, as they obtained their licenses and visas and entered the United States after the defendants learned of the federal investigation into the smuggling scheme.

45

Following the jury's verdict, the court denied the defendants' post-trial challenges to its evidentiary rulings. The court explained that Shapiro's proposed testimony would have confused the jury "by giving the impression that Hernandez acted on the advice of Shapiro's legal counsel—a defense that Hernandez in numerous pretrial hearings unequivocally stated that he was not pursuing." Doc. 452 at 25. It further explained that it excluded the evidence related to the other baseball players because it was irrelevant to the criminal prosecution.

Here, the court did not abuse its discretion in limiting Shapiro's testimony and preventing the defendants from presenting evidence about baseball players who waited to cross into the United States until they obtained their licenses and visas. *See Barsoum*, 763 F.3d at 1338. First, Shapiro was not qualified as an expert, and the defendants did not show that he had practical knowledge or experience—similar to Smith's and Baer's—that would permit him to give lay opinion testimony about OFAC policy. *See* Fed. R. Evid. 701. Even if, as the defendants argue, evidence that Shapiro attempted to comply with OFAC regulations might have been minimally relevant to negate their willfulness to violate the law, the court was permitted to exclude the evidence on the ground that its potential for confusing the jury substantially outweighed any probative value. *See* Fed. R. Evid. 403 (allowing the exclusion of relevant evidence where its probative value is substantially outweighed by the risk of "confusing the issues").

46

And it appears that Shapiro's evidence would have been particularly confusing given that the defendants—throughout the trial—never pursued the theory that they acted on Shapiro's advice in submitting documents with false information to OFAC and the State Department. Thus, the court's conclusion that such evidence was inadmissible was well within its discretion.[15]

The court also did not abuse its discretion in excluding evidence about the other baseball players. Those players—who were not identified in the indictment—entered the United States only after the federal government initiated its investigation into the smuggling operation. Under our precedent, this evidence could not negate the defendants' criminal intent to violate the law. *See United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir. 1983) (determining that noncriminal conduct introduced to "negate the inference of criminal conduct is generally irrelevant" (internal quotation marks omitted)).

---

[15] For the same reasons, the court did not abuse its discretion by rejecting the defendants' proposed good-faith jury instruction, as the defendants now argue. *Dohan*, 508 F.3d at 993. In the district court, the defendants argued that they relied on Shapiro's representations in submitting the unblocking and visa applications and requested that the court instruct the jury that "[w]illlfulness [to violate the law] may be negated by a good-faith misunderstanding of law, or a good-faith belief that one is not violating the law." Doc. 310 at 34. The court rejected that instruction, concluding that it would unnecessarily confuse the jury because the defendants had not presented that defense theory at trial. Instead, the court instructed the jury that "[t]he word 'willfully' means the act was committed voluntarily and purposely, with the intent to do something that the law forbids; that is, with the bad purpose to disobey or disregard the law." Doc. 331 at 26. This was not an abuse of discretion. The proposed good-faith instruction would have made little sense in the context of the trial as a whole. Moreover, the given instruction explained that the defendants' violation of the law must have been willful; implicit in that instruction is that the defendants could not be found guilty if they misunderstood or believed they were not violating the law.

### 3.    The District Court Did Not Abuse Its Discretion by Admitting Evidence of Uncharged Violence and Extortion.

Next the defendants argue that the court abused its discretion by admitting prejudicial evidence of uncharged violence or extortion inflicted on nonplayers or their families by third parties.  We reject this argument as well.

Rule 404(b) provides that evidence of other crimes, wrongs, or acts is inadmissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  Evidence extrinsic to the charged crimes is admissible only if it is relevant to an issue other than the defendant's character and its probative value is not substantially outweighed by a risk of undue prejudice.  *United States v. Foster*, 889 F.2d 1049, 1054 (11th Cir. 1989).

By contrast, evidence of criminal activity is intrinsic and falls outside the prohibitions of Rule 404(b) when it is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense."  *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (internal quotation marks omitted).

48

Evidence is inextricably intertwined with the evidence regarding the charged offense if it forms an "integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *Foster,* 889 F.2d at 1053 (internal quotation marks omitted). Such evidence must still satisfy the requirements of Rule 403—that is, the probative value of the evidence must not be substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. *Edouard*, 485 F.3d at 1344; Fed. R. Evid. 403.

Here, the superseding indictment did not expressly mention any use of violence or extortion in furtherance of the conspiracy. In its "Notice of Intent to Introduce Evidence," however, the government indicated that it would present evidence showing that Estrada and Hernandez placed players and their family members in direct harm of violence and financed a violent smuggling organization. Such evidence, the government argued, was admissible because it pertained to acts that were part of the conspiracy.

Before trial, Estrada and Hernandez filed two motions in limine to exclude evidence of violence, threats of violence, and non-baseball player smuggling. They argued that evidence of violence and extortion third parties committed toward non-players or their families was inadmissible under Rule 404(b). Additionally, they argued that the evidence was not part of the conspiracy charged

49

in the indictment, nor was it inextricably intertwined with the charged conspiracy. Finally, they argued that the danger of unfair prejudice outweighed any probative value that the evidence might have.

At a preliminary hearing, the court addressed the motions in limine. The court instructed that the government should present evidence "in terms of what was observed and what is germane to this case." Doc. 498 at 23. The court denied the motions in limine but required that the government inform the court before presenting evidence of non-baseball player violence or extortion at trial.

At the trial, government witnesses highlighted numerous instances of violence and extortion.[16] At the end of the trial, the court instructed the jury that "merely associating with certain people, even unsavory characters, and discussing common goals and interests does not establish proof of a conspiracy." Doc. 331 at 18.

---

[16] The government presented the following evidence of violence and extortion: The wife of one player testified that her husband's handler threatened to "chop[] [her husband] in pieces," Doc. 516 at 87; Jorge Padron, a baseball player from Cuba who was smuggled into the United States, testified that Nacho was assaulted and kidnapped; Padron testified that the smuggling organization smuggled non-player Cuban migrants to Mexico and had to pay another criminal organization a *piso* for each migrant; a non-player who paid the smuggling organization to smuggle her out of Cuba testified that she was not allowed to leave Mexico until her relative paid $10,000 to the other criminal organization; Tilbert testified that non-players who failed to pay the $10,000 fee were beaten; Reyes testified that Nacho had threatened to beat up a Cuban player unless he made a $50,000 ransom payment; and Martin testified that his handler once said that "bad things could happen" if he got upset, Doc. 519 at 62.

The court did not abuse its discretion by admitting the evidence. *See Barsoum*, 763 F.3d at 1338. The evidence was not impermissible bad acts evidence under Rule 404(b); rather, it was intrinsic evidence necessary to complete the story of the crimes and integral to the charged conspiracy. *See Edouard*, 485 F.3d at 1344; *Foster,* 889 F.2d at 1053. Specifically, the evidence related to Nacho, his criminal organization, and the *piso* the smugglers were required to pay to move Cuban players and their families first to Mexico and then to the United States. As the defendants' smuggling operation relied on Nacho's organization to move players into third countries, the evidence of violence and extortion helped explain the operation's methods. And although some of the evidence—such as testimony by a player's wife that a handler threatened to chop her husband into pieces—had the potential to elicit an emotional response from the jury, the district court reasonably concluded that the probative value of the evidence outweighed its potential prejudicial effect. *See* Fed. R. Evid. 403, advisory committee's note to 1972 proposed rule (explaining that "unfair prejudice" is "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"). The evidence was essential to illustrate how the smuggling operation partnered with a criminal organization in Mexico to smuggle Cuban players into the United States. In any event, any prejudicial effect was addressed by the court's curative instruction to the jury, which explained that the defendants'

51

association with unsavory characters was not enough to prove their guilt. *See United States v. Simon*, 964 F.2d 1082, 1087 (11th Cir. 1992) ("[A] prejudicial remark may be rendered harmless by curative instructions to the jury." (internal quotation marks omitted)). And so we conclude that the district court did not abuse its discretion in admitting the evidence of violence and extortion.

### 4.      The District Court Did Not Abuse Its Discretion by Admitting Lazo Jr.'s Testimony About Statements Made by Lazo Sr.

Estrada and Hernandez next argue that the district court abused its discretion by admitting statements purportedly made by Lazo Sr. through the testimony of Lazo Jr. under the co-conspirator exception to the rule against hearsay. This argument, too, must fail.

Although hearsay generally is not admissible, out-of-court statements made by co-conspirators may be offered for the truth of the matter asserted. Fed. R. Evid. 801(d)(2)(E). Before a co-conspirator's hearsay statement may be admitted, the government must prove by a preponderance of the evidence that: a conspiracy existed, the conspiracy included the declarant and the defendant against whom the statement is offered, and the declarant made the statement during the course of and in furtherance of the conspiracy. *United States v. Christopher*, 923 F.2d 1545, 1549–50 (11th Cir. 1991). We apply a "liberal standard in determining whether a statement is made in furtherance of a conspiracy." *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988).

At trial, the government called Lazo Jr.  Before he took the stand, the defense expressed concern that he would testify about a phone conversation between Lazo Sr., Hernandez, and Martin, as well as conversations he had with Lazo Sr. about the smuggling operation.  Such evidence, the defense argued, was impermissible hearsay.  The court permitted Lazo Jr. to testify about the phone call as long as his testimony was limited to "who was on the phone [and] the subject [of the phone call]."  Doc. 521 at 67.  The court also determined that Lazo Jr. could testify about his conversations with Lazo Sr. because there was no "question Lazo [Sr.] was a member of the conspiracy."  *Id*. at 85.

Lazo Jr. testified that he remembered his father having a phone conversation with Hernandez and Martin about Martin's desire to enter the United States without waiting for his visa.  Lazo Jr. heard Hernandez promise to contact MLB and, later, he observed Hernandez call the men back to say that it would not be a problem if Martin crossed the border without a visa.

Lazo Jr. further testified that Lazo Sr. would discuss the business with him so he could "learn" and "later on become involved in the business."  Doc. 521 at 87.  He had conversations with his father about compensation, the ball players, and the members of the conspiracy and their jobs.  After Lazo Sr. was arrested, Lazo Jr. took a much more active role in Estrellas del Beisbol; for example, he and

Hernandez worked together to pay off immigration officials and secure fake jobs for the players to aid in the smuggling operation.

Here, the district court did not abuse its discretion by admitting Lazo Jr.'s testimony about the conversation between Lazo Sr., Hernandez, and Martin and his conversations with Lazo Sr. about the organization. *See Barsoum*, 763 F.3d at 1338. The testimony was not impermissible hearsay because the declarant, Lazo Sr., was a member of the smuggling conspiracy, and his statements explaining the operation to Lazo Jr. and discussing Martin's MLB contract were made in furtherance of the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E).[17]

### 5. The District Court Did Not Abuse Its Discretion by Excluding Impeachment Evidence of Reyes's Perjury.

Lastly, Estrada and Hernandez contend that the district court improperly denied their motion to strike Reyes's testimony and prevented them from presenting evidence that Reyes committed perjury and was coached by the prosecution. Once again, we are unpersuaded.

At trial, the government called Reyes, who initially testified that Estrada accompanied him to Cancun in April 2009. When Reyes was recalled to the

---

[17] The defendants also argue that Lazo Jr.'s testimony was inadmissible because he was unable to recall some dates and names. But his inability to remember facts and details is the proper subject of cross examination and goes to his credibility, not the admissibility of his testimony. Such credibility determinations are the province of the jury, not the court. *See United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997) (stating that "credibility determinations are the exclusive province of the jury" (alteration adopted) (internal quotation marks omitted)).

witness stand the next day, he asked to "go back on [the] topic" of the Cancun trip. Doc. 518 at 4. He then testified that he had "spent the entire night going over everything that happened to [him]" and, upon reflection, he realized that Estrada was not present during the April trip to Cancun. *Id*. at 5. Reyes testified that he had not discussed his testimony with anyone after he left the courtroom the previous day.

Estrada and Hernandez moved for a mistrial based on Reyes's inconsistent testimony. The court asked the government if it had contacted Reyes about his testimony the previous evening, and the government responded that it had not. The court denied the motion for a mistrial, explaining that the issue of Reyes's inconsistency would be "left to th[e] jury." *Id*. at 26. Outside of the presence of the jury, Reyes told the court that he had not spoken to anyone about his testimony.

After the government rested, the defendants subpoenaed Reyes's cell phone records. They discovered that Reyes in fact had spoken with his attorney the evening after his first day of testimony.[18] They argued that this evidence showed that Reyes had committed perjury. They moved to strike Reyes's testimony.

The court denied the request and instead allowed the defense to "introduce the records showing [Reyes] contacted his lawyer when he said on the stand that he

---

[18] In addition, the phone records showed that Reyes had a quick phone call with a case agent, but the defendants did not focus on this phone call, which they acknowledged was related to the fact that Reyes was running late for court.

had not contacted anyone." Doc. 529 at 204–05. After the defense rested, both sides agreed to stipulate as to the contents of the phone records. The defense requested that the court permit it to inform the jury that Reyes, outside of the presence of the jury, told the court that it had not spoken to anyone the evening after his first day of testimony. The court denied that request, concluding that the stipulation of the phone records was sufficient. The defense then submitted the phone records into evidence and told the jury that, although Reyes had testified that he had not talked to anyone after his first day of testimony, the records reflected that he had spoken to his attorney.

Here, the court did not abuse its discretion in failing to strike Reyes's testimony. *See Barsoum*, 763 F.3d at 1338. The court permitted the defense to submit the phone records and inform the jury that Reyes had lied on the stand. Thus, the jury was well aware of Reyes's perjury; any additional evidence that Reyes had lied to the court would have been cumulative. Upon learning about the perjury, the jury—not the court—had to decide whether Reyes was credible. *See Calderon*, 127 F.3d at 1325. We affirm on this ground.[19]

---

[19] Because Estrada and Hernandez are entitled to no relief on their individual evidentiary claims, we reject their cumulative-error claim. *See United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) (holding, in a criminal appeal, that "[w]here there is no error or only a single error, there can be no cumulative error").

## IV.    CONCLUSION

For the reasons discussed above, we affirm the defendants' convictions.

**AFFIRMED**.