[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11840

_____

D.C. Docket No. 9:17-cr-80080-BB-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CORRY E. PEARSON,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 14, 2020)

Before MARTIN, NEWSOM, and BALDOCK,* Circuit Judges.

BALDOCK, Circuit Judge:

_____

* Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

Between 2012 and 2014, "Tax King" held itself out as an income tax preparation business with its principal office located in West Palm Beach, Florida. In May 2017, a grand jury indicted Tax King's sole owner, director, officer, and registered agent, Defendant Corry E. Pearson, on numerous counts of criminal misconduct related to his role in a federal income tax fraud scheme. Following a trial at which Defendant's knowledge of and participation in the scheme were the key foci, a petit jury convicted him on one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, sixteen counts of wire fraud in violation of 18 U.S.C. § 1343, eight counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1), two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and three counts of money laundering in violation of 18 U.S.C. § 1957. The district court sentenced Defendant to 100-months' imprisonment on the conspiracy, wire fraud, and money laundering counts, to be followed by 24-months' imprisonment on the aggravated identity theft counts. Defendant now appeals his convictions and sentence, raising myriad issues. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We affirm. In so doing, we set forth the facts only as necessary to our brief analyses of the issues.

On appeal, Defendant raises the following six issues related to his convictions: (1) whether the district court erroneously denied Defendant's motion for a mistrial; (2) whether the district court erroneously denied Defendant's motion to sever certain

2

counts from the indictment; (3) whether the district court erroneously denied Defendant's two motions to suppress evidence; (4) whether the district court erroneously denied Defendant's three motions in limine; (5) whether the proof at trial varied materially from the indictment resulting in an impermissible constructive amendment to or variance from the indictment; and (6) whether the district court erroneously denied Defendant's motion for judgment of acquittal based on insufficiency of the evidence. Defendant asks us to reverse and remand his case to the district court with instructions to discharge him or, in the alternative, grant him a new trial. Defendant also raises one issue related to his sentencing: whether, for purposes of determining Defendant's base offense level, the district court erred in calculating the amount of loss attributable to Defendant. On this issue, Defendant asks us to remand for resentencing.

*1. Motion for Mistrial*

Defendant's trial commenced on Wednesday, August 30, 2017, with the selection of a 15-member jury, comprised of twelve regular and three alternate jurors. On the first three days of trial, August 31, September 1, and September 5, the Government called nineteen witnesses, nine of whom testified to identity theft, and introduced nearly 150 exhibits. On Wednesday, September 6, with Hurricane Irma looming, defense counsel Stine asked the court to recess trial until after the hurricane. Explaining the jurors would have difficulty focusing under current

3

conditions, counsel commented: "I'm just asking that we just restart at some point later whenever this ends, whatever this becomes. Because there's no prejudice to anybody." Counsel further noted all of the Government's civilian witnesses had testified. Only Government agents had yet to testify and the defense did not intend to call any witnesses. Co-defense counsel Hanna joined in the request as did the Government, whereupon the court recessed for the day.

Federal courts in the Southern District of Florida were closed indefinitely beginning on September 7 and remained closed until Monday, September 18. On September 13, after the hurricane had passed, defense counsel Stine contacted the court to advise of his limited availability due to the effects of the hurricane on his home and farm. Counsel informed the court that his residence and farm were without power or plumbing. Counsel represented that based on the storm damage to his property, "his availability is exceptionally limited." For this reason and due to the court's concerns about juror availability in the aftermath of the hurricane, the court ordered the trial to resume on September 25, one week after the federal courts reopened. Defendant did not object.

On Monday, September 25, the parties appeared. The court informed them that two jurors were out of the country and would not be available until September 27. The court asked the parties if they wished to replace the two absent jurors with alternates and proceed that day. Instead of agreeing to utilize the alternate jurors or

4

delay the resumption of trial two additional days, Defendant moved for a mistrial and arguments ensued. In an order delivered from the bench, the court observed that the missing jurors were still under its admonition to discuss or speak about the case with no one and that this admonition applied both within and without Miami-Dade County. The court reasoned: "So in terms of the court's concern that there was any issue relating to the jurors' travel and the effect on the Defendant's right to a fair trial, the court sees no argument that would have merit."

Turning to concerns about the jurors' recollections due to the delay, the court explained it had permitted the jurors to take notes and had observed all the jurors, regular and alternate, taking notes throughout the course of trial. The court further explained that the parties would have the opportunity to remind the jury of the evidence in their closing arguments. And with this the court issued its ruling:

> So addressing each of the arguments that have been made for a mistrial—that is, the delay, the mismanagement, the fact that two jurors are in foreign countries, and the fact that the jurors may have not recalled all of the testimony—the court certainly does not believe that there has been any effect on the Defendant's right to a fair trial, and the motion for mistrial is denied.

The court scheduled trial to resume on Wednesday, September 27.

On direct appeal, we review the denial of a motion for a mistrial for an abuse of discretion. *Renico v. Lett*, 559 U.S. 766, 772–73 (2010). "The decision whether to grant a mistrial is reserved to the 'broad discretion' of the trial judge." *Id*. at 774. The district court may declare a mistrial when, "*taking all the circumstances into*

5

*consideration*," there is a "high degree" of necessity, sometimes referred to as "manifest necessity." *Id.* at 773–74 (emphasis added) (internal quotation marks omitted). District courts "are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere." *United States v. Perez*, 22 U.S. 579, 579 (1824) (Story, J.). We can say however, that the power to declare a mistrial "ought to be used with the greatest of caution, under urgent circumstances, and for very plain and obvious [reasons]." *Renico*, 559 U.S. at 774 (quoting *Perez*, 22 U.S. at 579).

Considering all the circumstances surrounding the 22-day delay of the trial in this case, from September 6 until September 27, as well as the extent and nature of the evidence presented by the Government prior to the delay, we hold the district court did not abuse its discretion in denying Defendant's motion for a mistrial. *Cf. United States v. Hay*, 122 F.3d 1233, 1235–36 (9th Cir. 1997) (where jury heard complex, technical evidence against defendants over the course of nearly four months, forty-eight day delay between the close of evidence and jury deliberations deemed prejudicial). After Hurricane Irma had passed through Florida, the earliest the court could have resumed trial would have been Monday, September 18, the day the federal courthouse reopened. The court waited without objection until the following Monday, September 25, in part because of defense counsel Stine's limited availability. On September 25, after unsuccessfully moving for a mistrial, Defendant

6

agreed to an additional two-day delay because he believed the missing jurors would be more favorable to him than the alternates. Defendant's suggestion that the trauma of the hurricane and the jurors' "inevitable" memory lapses rendered them incapable of fairly deciding his case has absolutely no support in the record. Upon reconvening, the district court properly instructed the jury to consider *all* the evidence. And the record, most notably the jury's acquittal verdict on two wire fraud counts, Counts 4 and 20 of the indictment, suggests this is exactly what the jury did. We see nothing even remotely akin to an abuse of discretion in the trial judge's decision to deny Defendant's motion for a mistrial.

## 2. *Motion for Severance*

Defendant has consistently claimed throughout these proceedings that while a "significant amount" of tax fraud occurred at Tax King between 2012 and 2014, the evidence established the fraud "could have easily occurred" without his personal knowledge or involvement. Presumably to bolster his defense, Defendant moved the district court to sever Count 17 and Counts 34 through 38, which he refers to as the "Wilson Counts," from the indictment. According to Defendant, the crimes alleged in these counts had nothing to do with Tax King or the wire fraud conspiracy alleged in Count 1. Count 17 alleged Defendant committed wire fraud by filing a fraudulent, purportedly self-prepared tax return in the name of Jarez Wilson for the 2012 tax year. Counts 34 through 38 alleged Defendant laundered money procured

from a similarly fraudulent 2011 tax-year return in Wilson's name. Unlike the wire fraud alleged in Count 17, the Government could not charge this fraud as a stand-alone execution of the scheme due to the statute of limitations. The district court denied the motion to sever based on improper joinder, as well as Defendant's motion for a new trial based on its failure to sever. The court reasoned the criminal act alleged in Count 17 was "part and parcel" of the fraudulent scheme, in particular its wire fraud and conspiracy aspects. The court further explained Counts 34 through 38 were likewise part of the tax fraud scheme because the funds that were part of the money laundering counts arose from monies Defendant received from his execution of the scheme in its early stages.

Defendant refers us to Federal Rules of Criminal Procedure 8(a) and 14(a) in support of his argument. The former permits the joinder of offenses where they "are of the same or similar character . . . , or are connected with or constitute parts of a common scheme or plan." Fed. R. Civ. P. 8(a) The latter provides relief from prejudicial joinder by permitting the district court to order separate trials of counts "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant." Fed. R. Civ. P. 14(a). We undertake a two-step analysis to determine whether separate charges were properly tried together. Looking to the face of the indictment, we first review *de novo* whether counts were properly joined at the outset under Rule 8(a). *United States v. Barsoum*, 763 F.3d 1321, 1336–37 (11th Cir.

8

2014). We then review the denial of a post-trial motion for a new trial based on the denial of a pre-trial motion to sever for an abuse of discretion. *Id.* at 1336. We will reverse the denial of a motion for a new trial only if Defendant can meet the "heavy burden" of demonstrating he received an unfair trial due to "compelling prejudice" as a result of the joinder. *Id.* at 1337.

Applying the Rule 8 standard, the Government properly joined both Counts 17 and 34 through 38 in the indictment. Count 17 is indisputably of the "same or similar character" as the other wire fraud counts. Counts 2 through 22 all charged Defendant with wire fraud based on the filing of fraudulent income tax returns. Moreover, Counts 2 through 17 alleged instances of wire fraud for which Defendant was responsible, all occurring within a two-month period in early 2013. Counts 34 through 38 were also properly joined because the allegations of money laundering were a part of the tax fraud scheme. As the complaint alleged, the monies laundered were "proceeds of specified unlawful activity," *i.e.*, wire fraud. Money laundering was the alleged manner by which Defendant and others intended to enjoy the fruits of their scheme. Accordingly, the Government properly joined Counts 17 and 34 through 38 to the remaining counts of the indictment consistent with Rule 8, and the district court did not err in denying Defendant's pre-trial motion to sever them.

Moving to the Rule 14 inquiry, our careful review of the trial transcript confirms Defendant did not suffer "compelling prejudice" as a result of the district

court's decision to try the Wilson Counts with the remaining counts of the indictment. Defendant says the Wilson Counts were not sufficiently related to the "Tax King" Counts. In particular, Defendant is concerned the jury may have used evidence of the former crimes, which "his fingerprints were all over," to infer his criminal disposition to commit the latter crimes under the Tax King facade. We are not so concerned. Suffice to say a jury, based on the voluminous and overwhelming evidence at trial, could easily conclude Defendant and Tax King were effectively one and the same. The Wilson Counts were sufficiently related to the Tax King Counts because the Government's proof on the former tended to bear directly upon Defendant's knowledge of and involvement in the tax fraud scheme operated out of Tax King's offices.

To be sure, the Wilson Counts, in particular Counts 34 through 38, represent the commencement of the fraudulent scheme, the complexity of which evolved over time in an effort to conceal the identities of those involved. The plot began to form when the IRS issued Defendant a preparer's tax identification number (PTIN) in January 2012. The same month, Defendant registered the fictitious name "Tax King" with the Florida Division of Corporations. In February 2012, before Tax King became fully operational, Defendant "tested the waters" by filing a federal income tax return for the tax year 2011 in the name of Jarez Wilson. Defendant had previously obtained Jarez's information from Jarez's mother, Irene Wilson, whom

he informed of his intended fraud. The return represented that Jarez had prepared and filed it himself without the assistance of a tax preparer. Like some other returns constituting part of the scheme, the return claimed a refund based on false gambling winnings. And like *many* other returns, the return claimed a refund for false wages. Defendant, with Irene Wilson's assistance (she later pled guilty to conspiracy to defraud the United States by false claims), laundered the monies the two received from Jarez's return, which exceeded $100,000. We need not belabor the point. A jury was entitled to find based on the evidence the Government presented that Jarez's false 2011 return was part of the conspiratorial scheme underlying the indictment's wire fraud counts. The district court did not abuse its discretion in denying Defendant's motion for a new trial based on its failure to sever the Wilson Counts.

### 3. *Motions to Suppress*

Before trial, Defendant also filed two motions to suppress evidence seized pursuant to a search warrant from Tax King's principal office located in a two-story building at 3600 Broadway, West Palm Beach, Florida 33407. According to Defendant's first motion, the search warrant was unlawfully issued because the affidavit in support thereof failed to articulate facts sufficient to establish probable cause for the search. In his second motion, Defendant claimed the warrant did not authorize examiners to access password-protected computer hard drives seized

11

during the search. Following a hearing, the district court denied both motions from the bench.

A district court's ruling on a motion to suppress presents a mixed question of law and fact. We review findings of fact for clear error and the application of the law to the facts *de novo. United States v. Shabazz*, 887 F.3d 1204, 1213 (11th Cir. 2018). We construe all facts in the light most favorable to the party that prevailed below, in this case the Government. *Id.* The law requires us to give great deference to a district courts' determination of probable cause. *Id.* at 1214. Specifically, an affidavit in support of a search warrant only need contain information sufficient to establish (1) a connection between the defendant and the place to be searched and (2) a fair probability evidence of the suspected crime will be found. *Id.*

Defendant's claim that the affidavit in support of the warrant failed to establish probable cause is meritless. The eleven page affidavit set forth in great detail the basis for probable cause. To summarize, a large number of federal income tax returns, resulting in tax refund claims, had been electronically submitted within the conspiracy's applicable time frame using the Electronic Filing Identification Number (EFIN) belonging to Tax King. The July 2012 EFIN application listed Defendant as the responsible official and primary contact for Tax King. The returns were filed from an IP address assigned to the building in which Tax King's principal office was located at 3600 Broadway in West Palm Beach. The affidavit specifically

referenced three returns for the 2013 tax year submitted under Tax King's EFIN. Each return claimed taxpayer wages of around $25,000 and consequent refunds for unemployed individuals incarcerated by the State of Florida during the applicable time period, all the victims of identity theft. As of early February 2014, 283 returns for the 2013 tax year had been electronically submitted to the IRS under Tax King's EFIN. All 283 submitted returns requested tax refunds. Agents had observed Defendant and Stephane Anor, a tax preparer ostensibly employed by Tax King (who subsequently pled guilty to conspiracy to commit wire fraud associated with the scheme), outside Tax King's office building. Some tax returns submitted under Tax King's EFIN listed Anor's PTIN. The affidavit in support of the search warrant undoubtedly established a *fair probability* agents would find evidence of criminal tax fraud associated with Defendant at Tax King's West Palm Beach office.

Defendant's claim that the Government needed an additional warrant to search the contents of the computers seized from Tax King because they were password protected is similarly without merit. Defendant cites no authority to support his proposition, and we have found none. The warrant authorized the seizure of "[c]omputers, electronic devices, or digital or electronic storage media" that might contain items whose seizure the warrant authorized. The warrant further authorized the seizure of "passwords, encryption keys, and other access devices that may be necessary to access the computers." This language indicates officials were

13

authorized under the warrant to access the computers by necessary means. Moreover, the warrant's language is consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), which authorizes the review of information stored on computers seized pursuant to a warrant: "A warrant . . . may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant." Fed. R. Civ. P. 41(e)(2)(B). The district court committed no legal error in denying Defendant's motions to suppress.

### 4. Motions in Limine

Defendant next claims the district court committed three evidentiary errors that rendered his trial fundamentally unfair, thus entitling him to a new trial. His first two claims are meritless. Defendant says both the introduction of and reference to statements of his co-conspirator Anor at trial violated his constitutional rights to confrontation and fundamental fairness. But Defendant does not point out where such evidence was introduced during trial, and the Government represents the court admitted no such evidence. Our review of the trial transcript confirms the Government's representation, and Defendant does not suggest otherwise in his reply brief. Defendant also says the Government improperly called IRS expert "witness(es)" to testify at trial that the tax returns alleged in the indictment were fraudulent. Again, Defendant does not tell us what this expert testimony was or

14

point out in the record where we can find such testimony.  The Government responds

that prior to trial the district court precluded any of its experts from proffering an

opinion as to fraudulent activity and, therefore, the Government did not seek to

introduce such evidence.  Defendant makes no effort to rehabilitate his argument in

his reply brief.

Defendant lastly claims he suffered "severe prejudice" when the district court

permitted the Government to introduce evidence of uncharged, allegedly false tax

returns at trial contrary to Federal Rule of Evidence 404(b) and the rules of intrinsic

evidence.  According to Defendant, the Government intended such evidence to give

the impression that Defendant personally filed these returns when these returns did

not contain Defendant's PTIN.  But Defendant does not discuss any particular

uncharged return or cite us to the record, so we are left to ponder how the evidence

about a particular return unfairly prejudiced his defense.

In any event, regardless to what specific evidence Defendant refers, this Court

"repeatedly has held that evidence of uncharged conduct that is part of the same

scheme or series of transactions and uses the same *modus operandi* as the charged

offenses is admissible as intrinsic evidence outside the scope of Rule 404(b)."

*United States v. Ford*, 784 F.3d 1386, 1394 (11th Cir. 2015).  We review the

admission of such evidence only for an abuse of discretion.  *Id.*  Our record review

reveals that all evidence of returns not referred to in the indictment—well in excess

15

of 1,000, maybe closer to 2,000, were submitted to the IRS over the course of the conspiracy—were filed within the time frame of the conspiracy using the same sundry methods as those returns referenced in the indictment. These uncharged returns formed an integral part of the conspiracy, whether (1) filed as self-prepared, (2) filed in the name of conspirators or sham tax preparers ostensibly employed by Tax King, or (3) filed through another company controlled by Defendant known as NPN Multiservices. The evidence of uncharged fraudulent returns undoubtedly was probative evidence "inextricably intertwined" with the scheme charged in the indictment. *Id.* As such, the district court did not abuse its discretion in admitting evidence of such returns.

5. *Constructive Amendment / Material Variance*

Continuing on, Defendant cursorily argues that he is entitled to a judgment of acquittal because a constructive amendment to the indictment occurred as a result of evidence the Government presented at trial relating to a number of the wire fraud counts. A constructive amendment, which constitutes *per se* reversible error, "occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015). The totality of Defendant's argument is just this: The indictment alleged Defendant "transmitted or caused to be transmitted" the returns that were the subject of the wire

16

fraud counts when the evidence showed it was someone else who prepared these returns. Defendant, however, fails to enlighten us as to why he, under the auspices of Tax King or any related entity with which he was closely involved, could not cause the transmission of a tax return that did not name him as its preparer. The perfunctory nature of Defendant's argument constitutes a waiver of such argument. *E.g.*, *United States v. Woods*, 684 F.3d 1045, 1064 n.23 (11th Cir. 2012); *see also* Fed. R. App. P. 28(a)(8)(A) (Arguments contained in an appellant's opening brief must include "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.").

Defendant makes the related argument that a variance occurred when the Government presented evidence of fraudulent returns submitted to the IRS by way of a tax preparation business known as NPN Multiservices (NPN). According to Defendant, the Government attributed all the fraudulent filings related to NPN to Defendant even though the indictment did not allege those filings were attributable to him. A variance occurs when the facts proved at trial deviate from the facts stated in the indictment but the essential elements of the offense are the same. *Holt*, 777 F.3d at 1261. The two sets of facts must correspond to ensure the defendant receives proper notice of the charges against which he must defend and is protected against a later prosecution for the same offense. *Id.* A variance requires reversal only when the defendant can establish his rights were substantially prejudiced. *Id.*

17

The Government points out, and Defendant does not assert otherwise, that he did not present his variance claim in the district court, so our review is for plain error. To demonstrate plain error, Defendant must show (1) an error, (2) that is plain, and (3) that affects his substantial rights. *United States v. Deason*, 965 F.3d 1252, 1265 (11th Cir. 2020). If these three conditions are met, we may then exercise our discretion to notice a forfeited error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* As an exception to the contemporaneous objection rule, the plain error rule places a demanding standard before Defendant which he does not even argue he can meet. *Id.*

At trial, the Government presented evidence that numerous fraudulent returns were filed by NPN. NPN was a fictitious company name registered to an individual known as Napoly St. Fleurant, with its principal place of business listed as 902 West 7th Street in West Palm Beach. The IRS issued St. Fleurant an EFIN in January 2014. Shortly thereafter, fraudulent tax returns for the 2013 tax year were filed using this EFIN and an internet connection registered to NPN. One of those returns was charged in Count 22 (on which the Government agreed to a judgment of acquittal following trial) as part of the wire fraud scheme. The district court also admitted evidence of similarly fraudulent NPN returns not identified in the indictment.

The evidence at trial linked these fraudulent returns to Tax King and, in turn, Defendant. For instance, Kyle Dye, a victim of identity theft, purportedly prepared

the returns filed through NPN.  Kyle is the late husband of Linda Dye, also a victim of identity theft and an individual listed as preparing fraudulent returns for Tax King. Perhaps even more injurious to Defendant is the fact that during the search of Tax King's principal office, agents located a Comcast modem together with a work order stating the modem belonged to NPN.  The work order stated NPN was located in a suite next to Tax King in the same building at 3600 Broadway in West Palm Beach. But the evidence showed NPN had never been located anywhere in the building. Thus, the Government reasonably posited that Defendant knew about and was responsible for causing the transmissions of fraudulent returns filed through NPN.

Defendant asserts the Government never alleged or indicated in the indictment that it would attribute the returns associated with NPN to him.  But Defendant does not dispute that the indictment charged him with a count of wire fraud based on a fraudulent return filed by way of NPN.  Nor does he dispute the Government's statement that he received pretrial discovery and notice about NPN and its tax returns, evidence which he now says prejudiced him.  Defendant was neither unjustifiably nor substantially prejudiced by evidence of the NPN returns because the Government established the fraud associated with such returns was part of the tax fraud scheme in which Defendant played a significant part.  The district court thus did not err by denying Defendant any relief based on his claim of variance.

VI.  *Sufficiency of the Evidence*

19

As a final challenge to his convictions, Defendant broadly posits that a jury could not find him guilty beyond a reasonable doubt of any criminal conduct—not wire fraud, conspiracy to commit wire fraud, aggravated identity theft, or money laundering—based on the evidence the Government presented at trial. Therefore, Defendant says the district court erred in denying him a judgment of acquittal on all thirty counts of conviction. We review challenges to the sufficiency of the evidence in criminal cases *de novo*, viewing the evidence in the light most favorable to the Government. *United States v. Estrada*, 969 F.3d 1245, 1265 (11th Cir. 2020). If a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt based on the evidence presented at trial, then the evidence is sufficient. *Id.* at 1265–66. We assume the jury made all credibility choices in support of the verdict and accept all reasonable inferences tending to support the Government's case. *Id.* at 1266. Putting forth a hypothesis of innocence does not establish the Government's evidence was insufficient. *Id.* The question is not whether a jury could have acquitted Defendant, but rather, whether a reasonable jury could have found Defendant guilty beyond a reasonable doubt on the charges presented. *Id.*

Defendant tells us he opened Tax King "to prepare returns for individuals and to help them obtain fast tax refunds when applicable. He did not open the business knowing other unscrupulous people would use him as a conduit for tax fraud." Carefully avoiding any discussion of the record facts or the reasonable inferences a

20

jury could draw in the Government's favor, Defendant's story is that he was merely "the officer of a company that failed to exercise 'ordinary prudence' over the control, maintenance, and operation of his business." The voluminous trial transcript consisting of over 1,000 pages which we have carefully read and studied, paints a different picture. The district court concluded the evidence in support of the jury's verdict was "overwhelming" on all counts. The court was correct. As the Government pointed out to the jury, this case is not about a legitimate tax preparation business where some fraud was occurring. This case is about "a massive fraudulent scheme masquerading as a tax preparation business." Anyone who has read the trial transcript would be hard-pressed to disagree.

The evidence showed that early in 2012 Defendant registered himself as owner of Tax King, later incorporated Tax King, and served as its sole officer and director. Defendant was Tax King's sole registered agent and signatory on its bank account. He rented Tax King's principal office space in West Palm Beach. The rent included an IP address from which fraudulent tax returns were filed. Defendant applied for Tax King's EFINs and his own PTIN. Tax King had EFINs assigned to its principal office and later to two Florida satellite offices, one of which was located at Defendant's home in Riviera Beach and the other in Orlando. By all record appearances, Defendant was in charge of Tax King's operations.

Defendant and at least one other individual commenced the criminal phase of the scheme for the tax year 2011 in early 2012. We have already mentioned in our discussion of Defendant's severance claim how he and Irene Wilson agreed to defraud the IRS by filing a fraudulent 2011 tax return in the name of her son, Jarez, from an IP address assigned to 3600 Broadway in West Palm Beach. And how they then laundered the six-figure proceeds—over $80,000 of which ended up in Defendant's bank account—beginning with a deposit into Irene's PBC Credit Union checking account. Next, one day after submission of Wilson's return, the IRS received the purported 2011 return of Reshon Mathis. Like Wilson's return, Mathis's return was filed from Tax King's IP address and reported gambling winnings based on a false Form W-2G. This return claimed a refund of over $86,000. The IRS rejected Mathis's return and did not pay the requested refund. Shortly thereafter, a 2011 return in the name of Sharon Moore requesting a refund of nearly $41,000 was submitted to the IRS through the same IP address. The return requested Moore's refund be deposited into an account at TD Bank in the name of Cessaley Pearson, notably an individual who shared Defendant's surname. The address listed on the account was Defendant's home address in Riviera Beach, Florida. Someone had opened the TD Bank account just one day before submission of Moore's tax return to the IRS. Again, the IRS refused to pay the requested refund.

22

The same bank account, which was opened with a $20 deposit, was closed six days later with a $20 withdrawal.

The scheme progressed in 2013 to where fraudulent 2012 tax year returns would identify Tax King as their source. Some of the returns, around ninety that the IRS initially accepted, identified Defendant as the preparer. Others identified Stephane Anor as preparing them. (Recall Anor was a so-called Tax King employee who was charged in this case with conspiracy to commit wire fraud before pleading guilty.) Still other returns identified victims of identity theft, namely Linda Dye and Febe Barthe, as return preparers. In December 2012, Tax King opened an account with Drake Software. Tax King used Drake's tax preparation software and services to file tax returns for the 2012 and 2013 tax years. The IRS rejected over half of those returns outright. Defendant was Tax King's sole point of contact for Drake and spoke frequently with its representatives for assistance. Tax King also opened accounts with Advent Financial Services and EPS Financial, both of which provided a means for a taxpayer to pay a tax preparation fee from a tax refund with the remaining balance then issued on a debit card—ideal for "clients" whose identities were stolen. These two accounts listed Defendant as the sole contact for Tax King and his home address as Tax King's mailing address. An EPS representative testified that Tax King's funding ratio during the latter part of the scheme was 15%.

23

This meant the IRS was issuing refunds in only 15% of Tax King's returns with which EPS was involved. A funding ratio lower than 60% raised a "red flag."

For the 2012 tax year, Tax King filed over 1,000 tax returns with the IRS seeking refunds totaling over $4 million. No Tax King return showed federal tax owing. The IRS paid a refund on 292 of those returns totaling just under $1 million. For the 2013 tax year, Tax King filed over 500 federal returns seeking refunds totaling just under $2 million. Once again, no Tax King return showed federal tax owing. The IRS paid a refund on 99 of those returns totaling just under $400,000. Many Tax King returns for this tax year were fraudulent in one or more respects. Some constituted outright taxpayer identify theft as established by the trial testimony of numerous victims of the scheme. Other returns overstated the amount of a taxpayer's earned income. Fake W-2s exaggerating the amount of tax withheld often accompanied these returns. Or, as in the case of multiple returns Defendant personally prepared, the returns outright lied about the taxpayer's place of employment. Tax King even filed fraudulent returns in the names of unemployed incarcerated individuals. In other instances, Tax King returns sought refunds using the American Opportunity Tax Credit (AOTC). The AOTC is an education credit of up to $2,500 that allows an eligible taxpayer incurring educational expenses to claim a $1000 refund even if the taxpayer owes no tax. Tax King filed hundreds of

returns claiming this credit for both the 2012 and 2013 tax years. In most instances, the credit had no basis in fact whatsoever.

The 2013 tax year was Tax King's last. NPN, the fictitious tax preparation business we addressed in our discussion of Defendant's variance claim, appeared as part of the scheme in January 2014. Over the course of two days that same month, NPN filed 146 federal returns claiming about $450,000 in refunds. Two months later, on March 12, 2014, agents executed a search warrant for Tax King's West Palm Beach office on a weekday afternoon during tax season. Notably, no one was present at the small one room office. Taped on the inside of the office building's front door was a sign that read: "Please call Stephane at (561) 260-8778 or Corry at (561) 255-7840." A placard inside the building also identified Stephane Anor and Defendant Corry Pearson and listed their phone numbers. The placard advertised: "Tax King. Get the most out of your refund. . . . Fast, affordable, reliable tax pros. W-2 and last check accepted. Mobile services." Somewhat more detailed flyers to the same effect were found on a table in the building's hallway.

Inside Tax King's office, agents seized a large quantity of incriminating evidence. We have already noted that inside the office agents located a Comcast modem and work order stating the modem belonged to NPN. Among other items, agents also found (1) records of three supposedly self-prepared returns that would have no reason to be in the files of a tax preparation service; (2) numerous copies of

25

fraudulent tax returns, some of which listed Defendant as the preparer; and (3) a number of fake driver's licenses. Forensic analysis of two computers seized from the office revealed someone had used the computers to search businesses and educational institutions and even "dead people." The computers contained no financial data, accounting records, or payroll information for Tax King despite the fact it had "earned" $165,000 in tax preparation fees over the course of two years. After agents executed the search warrant on March 12, Defendant's landlord, Keith Miller, never saw or heard from Defendant again. As of March 19, 2014, Tax King's bank account, on which Defendant was the sole signatory, contained $67,178.80. After one cash withdrawal on March 21 and three withdrawals on March 26, the account's remaining balance was $178.80.

Despite all the foregoing evidence and much more we have not recited in the interest of time and space, Defendant asserts a reasonable jury could not find he had any knowledge of the criminal wrongdoing alleged in the indictment. Regarding the sixteen counts of wire fraud and one count of conspiracy to commit the same, Defendant says the Government presented no direct evidence that he prepared or filed any tax returns on behalf of those individuals described in the wire fraud counts, or that he knowingly and voluntarily agreed with anyone to achieve the unlawful objective of a wire fraud scheme. Evidence supporting Defendant's convictions, however, may be direct or circumstantial, and we do not distinguish between the

26

weight given either sort of evidence. *United States v. Guevara*, 894 F.3d 1301, 1307 (11th Cir. 2018).

To prove wire fraud, the Government was not required to prove Defendant personally prepared those fraudulent returns identified in the wire fraud counts or personally transmitted them over wire. The Government could prove wire fraud by establishing Defendant knowingly devised a scheme to defraud and caused a writing to be transmitted over wire for the purpose of executing such scheme. *United States v. Feldman*, 931 F.3d 1245, 1257 (11th Cir. 2019). The Government could prove a conspiracy to commit wire fraud by establishing Defendant agreed with another to pursue the scheme's unlawful objective. *Id.* at 1257–58. The jury heard evidence about Defendant's knowledge of and participation in the scheme in its early stages, most notably the testimony of Irene Wilson. The jury also heard a voluminous amount of evidence, outlined above, giving rise to reasonable inferences bearing on Defendant's guilt, namely that he was significantly involved in *all* of Tax King's operations and that he agreed with others such as Irene Wilson and Stephane Anor to carry out the scheme.

A reasonable jury could readily find based on the evidence presented that Defendant knowingly devised a scheme to defraud the Government of money and participated in a conspiracy to achieve the same. *See United States v. Langford*, 647 F.3d 1309, 1320 (11th Cir. 2011) (wire fraud encompasses a defendant's intentional

participation in a scheme to defraud another of money).   Assuming, as the law requires, that the jury made all credibility choices in support of the verdict and accepted all reasonable inferences tending to support the Government's case, *Estrada*, 969 F.3d at 1265, the record evidence establishes beyond a reasonable doubt that Defendant was aware of and understood the nature of the wire fraud scheme and was instrumental in perpetrating it in agreement with others.

With this analysis upholding his wire fraud convictions, Defendant's argument regarding the sufficiency of the evidence on the five counts of money laundering necessarily falters.   His argument on those counts is simply "inasmuch as there was insufficient evidence to prove the offenses concerning wire fraud, these money laundering counts must fall as well."   This leaves us with Defendant's challenge to the eight counts of aggravated identity theft.   Again, Defendant concedes the commission of these crimes, each of which was tied to a wire fraud count, but insists he was not involved.   And again, just like the wire fraud counts, the Government's evidence permitted the jury, albeit through reasonable inferences drawn from circumstantial evidence, to conclude otherwise.

The district court instructed the jury that to establish a violation of the identity theft statute, 18 U.S.C. § 1028A(a)(1), the Government had to prove Defendant (1) knowingly transferred, used, or possessed (2) the means of identification of another person, (3) knowing the means of identification belonged to another, (4) without

28

lawful authority (5) during and in relation to a felony enumerated in §1028A(c), one of which is wire fraud. *United States v. Hurtado*, 508 F.3d 603, 606–07 (11th Cir. 2007), *abrogated in part by Flores-Figueroa v. United States*, 556 U.S. 646, 647 (2009) (recognizing the element that a defendant must know the means of identification at issue belonged to another). Importantly, however, the court also instructed the jury that Defendant could be found guilty of the substantive offense if the jury found he aided and abetted such offense in violation of 18 U.S.C. § 2. Thus, the jury could find Defendant guilty of aggravated identity theft even if Defendant did not perform every act necessary to commit the crime. *United States v. Sosa*, 777 F.3d 1279, 1293 (11th Cir. 2015). Under subsection 2(b), Defendant was liable for aggravated identity theft (as well as the other substantive crimes charged in the indictment) if the evidence was sufficient for a reasonable jury to conclude he "willfully cause[d] an act to be done which if directly performed by him or another would be an offense against the United States." 18 U.S.C. §2(b).

We have already explained that the evidence presented, both direct and circumstantial, established Defendant's knowing participation in a scheme to defraud the Government of money. The evidence further established that the scheme consisted in substantial part of misusing the identities of real taxpayers. Defendant's extensive involvement in Tax King's operations—operations that appear almost if not entirely illegitimate—coupled with the sizable cache of falsified personal

29

documents located in its principal office and the evidence of identity theft associated with its business, permitted the jury to infer that the aggravated identity theft alleged in the indictment occurred with the oversight and under the direction of Defendant in violation of 18 U.S.C. §§ 1028A(a)(1) & 2. Accordingly, the district court did not err in denying Defendant's motion for judgment of acquittal in its entirety.

## VII. Amount of Loss Calculation

The final issue Defendant raises pertains to his sentence. At sentencing, the district court adopted a revised pre-sentence investigation report (PSI) and found Defendant intended to cause a loss of $5,173,274. The court applied an 18-level upward adjustment to his base offense level because the loss was more than $3.5 million but not more than $9.5 million. U.S.S.G. § 2B1.1(b)(1)(J). Defendant's final adjusted offense level was 31. Coupled with a criminal history category of I, Defendant's guideline range was 108 to 135 months, plus a mandatory 24-month consecutive sentence for the aggravated identity theft counts. The court granted Defendant a slight variance from the guideline range and sentenced him to 124 months in prison.

Prior to sentencing, Defendant generally objected to "any and all purported factual assertions contained with the [PSI] in its entirety." Defendant's only specific objection to the PSI's calculation of intended loss involved losses attributable to three tax returns charged in counts on which the Government agreed to a judgment

of acquittal following trial.  The entire loss amount to which Defendant objected was $11,609.00, which he acknowledged would not affect the upward adjustment.  The district court denied the specific objection and asked Defendant if he would make any further arguments "other than a general objection."  New defense counsel (now court-appointed as a result of Defendant's indigency) informed the court that "[a]t this point, we're not in a position to argue anything specific to the court."  The court commented that Defendant's general objection was insufficient to allow it to make a "full determination" of loss.  Rather, "based on the [trial] testimony . . . , the court overrule[d] the general objection to the loss amount."

With nary a citation to the record, Defendant presents his opening appellate argument challenging the court's loss calculation in one sentence:  "[T]he trial court erred at the sentencing hearing by attributing the entire loss amount of the alleged conspiracy to the Defendant without limiting the loss amount to the Defendant's specific relevant conduct, nor did the court make a finding as to what losses were reasonably foreseeable."  Defendant neither identifies his relevant conduct nor tells us what losses that the court attributed to him were not reasonably foreseeable.  Once again, the perfunctory nature of Defendant's sentencing argument in his opening brief constitutes a waiver of such argument.  *Woods*, 684 F.3d at 1063 n.23; Fed. R. App. P. 28(a)(8)(A).  But even assuming otherwise, Defendant acknowledges we would review the district court's acceptance of the PSI's loss calculation only for

plain error. Yet Defendant make no argument to suggest the district court plainly erred by doing so other than to say "[i]n this instance, the Defendant had demonstrated clear and plain error." Defendant needed to tell us with some particularity how his own loss calculation amounts to less than $3,500,000, such that he suffered any substantial prejudice from the 18-level enhancement to his base offense level. This he has not done.

\* \* \*

For all the foregoing reasons, the district court's judgment of conviction and sentence is AFFIRMED.